**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

JARED LEE LOUGHNER,
        *Defendant-Appellant.*

Nos. 11-10339;
    11-10504;
    11-10432

D.C. No.
4:11-cr-00187-
    LAB-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Larry A. Burns, District Judge, Presiding

San Francisco, California*

Filed March 5, 2012

Before: J. Clifford Wallace, Marsha S. Berzon, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Concurrence by Judge Wallace;
Dissent by Judge Berzon

---

*Appeal No. 11-10339 was argued and submitted on August 30, 2011.
Appeal No. 11-10504 was argued and submitted on November 1, 2011.
Appeal No. 11-10432 was submitted, without argument, on February 27, 2012.

2355

**COUNSEL**

Judy Clarke, Clark & Rice, APC; Mark Fleming, Law Office of Mark Fleming; Reuben Camper Cahn, Ellis M. Johnston III, Janet Tung, Federal Defenders of San Diego, Inc., San Diego, California, for the appellant.

Ann Birmingham Scheel, Acting United States Attorney, Dennis K. Burke, United States Attorney, Christina M. Cabanillas, Appellate Chief, Bruce M. Ferg, Assistant United States Attorney, United States Department of Justice, Tucson, Arizona, for the appellee.

Aaron M. Panner, Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, D.C., for Amici American Psychiatric Association and the American Academy of Psychiatry and the Law.

## OPINION

BYBEE, Circuit Judge:

Jared Lee Loughner stands accused of the January 2011 murder of six people, including U.S. District Judge John Roll, and the attempted murder of thirteen others, including U.S. Representative Gabrielle Giffords. Loughner was committed to a Bureau of Prisons ("BOP") medical facility to determine if he was competent to stand trial. After the medical staff concluded that he was not competent, the district court ordered him committed for a period of four months to determine if he could be restored to competency. While he was in custody, the facility determined that Loughner was a danger to himself or others and conducted hearings pursuant to 28 C.F.R. § 549.46(a), referred to as *Harper* hearings, to determine if he could be involuntarily medicated. *See Washington v. Harper*, 494 U.S. 210 (1990). The district court denied Loughner's emergency motion to enjoin the involuntary medication decision of June 14, 2011. The appeal from that order is before us as No. 11-10339. In the interim, Loughner was involuntarily medicated on an emergency basis pursuant to 28 C.F.R. § 549.43(b) (2010) and the district court denied Loughner's emergency motion for a prompt post-deprivation judicial hearing. The appeal from that order is before us as No. 11-

10432. The district court likewise denied Loughner's emergency motion to enjoin the involuntary medication decision of September 15, 2011. Subsequently, the district court ordered Loughner's commitment to be extended by an additional four months to render him competent to stand trial. *See* 18 U.S.C. § 4241(d). The appeal from the September 15 involuntary medication and extension of commitment orders is before us as No. 11-10504. We affirm both orders at issue in appeal No. 11-10504. We dismiss appeals No. 11-10339 and No. 11-10432 as moot.

## I. BACKGROUND AND PROCEEDINGS

On March 3, 2011, a federal grand jury indicted Jared Lee Loughner for multiple criminal offenses arising from a January 8, 2011, shooting incident in Tucson, Arizona, in which six people were killed and thirteen people were injured. The charges included the attempted assassination of Congresswoman Gabrielle D. Giffords, the murder of Federal Judge John M. Roll, the murder and attempted murder of other federal employees, injuring and causing death to participants at a federally provided activity, and several related weapons offenses.

At a detention hearing on January 10, 2011, the district court determined that Loughner was a danger to the community and should be federally detained pending trial. Magistrate Judge Lawrence O. Anderson found that there was no condition or combination of conditions that would reasonably assure the safety of the community, and ordered Loughner committed to the custody of the Attorney General for confinement in a corrections facility.

On March 9, 2011, the district court granted the government's motion for a competency examination to be conducted at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri ("FMC-Springfield"), by BOP medical personnel, pursuant to 18 U.S.C. § 4247. BOP psychologist Dr.

Christina Pietz and court-appointed psychiatrist Dr. Matthew Carroll determined that Loughner was not, at that time, competent to stand trial and diagnosed him with schizophrenia. The district court agreed, and on May 25, 2011, ordered Loughner committed for a four-month period of hospitalization at FMC-Springfield to determine whether he could be restored to competency, pursuant to 18 U.S.C. § 4241(d)(1).

## A. *Involuntary Medication*

After he was returned to FMC-Springfield, Dr. Pietz asked Loughner, "on a daily basis," if he was willing to take psychotropic medication voluntarily, but Loughner consistently declined to engage in such treatment.

### 1. *Harper I*

On June 14, FMC-Springfield staff conducted an administrative hearing, pursuant to the procedures outlined in 28 C.F.R. § 549.43[1] and *Harper*, 494 U.S. 210, to determine whether Loughner should be forcibly medicated on dangerousness grounds ("*Harper I* hearing"). Dr. Carlos Tomelleri, an independent psychiatrist not involved in Loughner's diagnosis or treatment, presided over the *Harper I* hearing, and Dr. Pietz and Dr. Robert Sarrazin, Loughner's treating psychiatrist, also participated. John Getchell, a licensed clinical social worker ("LCSW"), was appointed by FMC-Springfield to serve as Loughner's staff representative in the administrative hearing process. According to Getchell, he met with Loughner the day before the hearing to explain his (Getchell's) role in the proceeding, the purpose of the hearing, Loughner's rights, and to answer any questions Loughner may have about the process. In a written statement, Getchell stated that he informed Loughner of his right to have wit-

---

[1] The regulation was amended effective August 12, 2011. *See* 76 Fed. Reg. 40229, 2011 WL 2648228 (Aug. 12, 2011). The former § 549.43 is now contained in § 549.46.

nesses present at the hearing, but that Loughner did not wish to have any witnesses present. Before the hearing, Getchell again asked if Loughner wanted any witnesses and Loughner responded, "Just my attorney." Getchell then notified Dr. Pietz and Dr. Tomelleri of Loughner's "request to have an attorney present for the proceeding."

The *Harper I* hearing took place in Loughner's cell. At the outset, Loughner said "You have to read me the Bill of Rights or I won't talk to you" and "I'm not an American citizen." After Dr. Tomelleri explained that that was not part of the hearing procedure, Loughner barricaded himself behind his bed and refused to participate in the hearing, even though he was encouraged to do so by Dr. Pietz, Dr. Sarrazin, and Mr. Getchell. When he finally spoke, Loughner stated he would "plead the fifth," he denied that he had a mental illness, and he responded "No" when asked if he would consider taking medication that would improve his condition. There is no record of Getchell making any statements or inquiries on Loughner's behalf.

In the Involuntary Medication Report, Dr. Tomelleri authorized involuntary medication after finding that Loughner's mental disease made him a danger to others. In the Justification section of the report, Dr. Tomelleri explained that Loughner had become enraged while being interviewed and yelled obscenities; had thrown objects, including plastic chairs and toilet paper; had spat on his attorney, lunged at her, and had to be restrained by staff; and his behavior had been characterized by indications that he was experiencing auditory hallucinations, including inappropriate laughter, poor eye contact, yelling "No!" repeatedly, and covering his ears.

Noting that Loughner had been diagnosed with schizophrenia, Dr. Tomelleri explained in the report that "[t]reatment with psychotropic medication is universally accepted as the choice for conditions such as Mr. Loughner's." Dr. Tomelleri rejected other, less intrusive measures (e.g., psychotherapy,

minor tranquilizers, seclusion and restraints), because they "are not practicable," "do not address the fundamental problem," "have no direct effect on the core manifestations of the mental disease," or "are merely temporary protective measures with no direct effect on mental disease."

Loughner was advised that if involuntary medication was approved, he would have twenty-four hours to appeal the decision to the Administrator of the Mental Health Division. With the help of Getchell, Loughner submitted a written appeal that was laced with profanities. The Associate Warden of Health Services ("Associate Warden") denied the appeal. The Associate Warden restated the evidence and found that "[w]ithout psychiatric medication, you are dangerous to others by engaging in conduct, like throwing chairs, that is either intended or reasonably likely to cause physical harm to another or cause significant property damage. . . . At this time, medication is the best treatment for your symptoms."

On June 21, 2011, FMC-Springfield began medicating Loughner as prescribed by Dr. Sarrazin. After becoming aware of Loughner's involuntary medication, defense counsel filed an emergency motion in the district court on June 24, asking the court to enjoin FMC-Springfield from forcibly medicating Loughner. Loughner argued that the involuntary medication order violated his substantive due process rights by treating his mental illness without considering less intrusive methods to ameliorate his dangerousness; failed to consider how the medication would implicate his fair trial rights; and violated his procedural due process rights, as a pretrial detainee, because the hearing should have been held before a court, Loughner's requested witness should have been called, and the specific drug and dosage that would be administered should have been set out in the hearing.

On June 29, 2011, the district court held a hearing on the motion. At the hearing, defense counsel requested an evidentiary hearing and the opportunity to present testimony from a

former BOP official and a forensic psychiatrist experienced in prison administration and forced medication decisions. The district court denied both the motion and the request for an evidentiary hearing, first in an oral order from the bench, and then in a written order. In the written order, the district court explained that because Loughner was being medicated on dangerousness grounds, the substantive and procedural standards described in the Supreme Court's decisions in "*Harper*, and not *Riggins*[2] or *Sell*,[3] applies," and "*Harper* is clear that doctors, not lawyers and judges, should answer the question whether an inmate should be involuntarily medicated to abate his dangerousness and maintain prison safety." Order on Def's Mot. to Enjoin Medication 3, July 1, 2011. The court rejected any argument that Loughner was entitled to the higher substantive due process rights afforded in *Riggins* and *Sell* because of his status as a pretrial detainee, finding that a "dangerous individual is dangerous, whether he is a pretrial detainee or has been convicted and sentenced." *Id.* at 4. The district court also rejected any argument that the staff at FMC-Springfield operates under a structural conflict of interest.

To determine the appropriate standard of review for FMC-Springfield's decision to medicate forcibly a pretrial detainee on dangerousness grounds pursuant to *Harper*, the district court adopted the holding and rationale of *United States v. Morgan*, 193 F.3d 252, 262 (4th Cir. 1999). In that decision, the Fourth Circuit found that the dangerousness determination is to be made by prison medical personnel and that the court's involvement should be limited to a review for arbitrariness. The district court found that the procedures followed by FMC-Springfield staff at the *Harper I* hearing, and the findings of the presiding psychiatrist, were not arbitrary. In response to Loughner's argument that he was denied his right to call a witness, the district court agreed "with the apparent interpretation of [the request] by [Loughner's] staff represen-

---

[2] *Riggins v. Nevada*, 504 U.S. 127 (1992).

[3] *Sell v. United States*, 539 U.S. 166 (2003).

tative who . . . construed the statement as a request for legal representation at the hearing, to which he is not entitled." Order on Def's Mot. to Enjoin Medication 7-8.

Loughner filed a Notice of Appeal from the district court's order on July 1, 2011, and sought an emergency stay of forced medication from this court (No. 11-10339). A motions panel granted a temporary stay of forced medication that evening. After hearing oral arguments on the emergency motion, the motions panel issued an order on July 12, 2011, staying involuntary administration of all psychotropic medication until resolution of this appeal.

2.   Emergency Medication Decision

After medication was discontinued on July 1, Loughner's condition deteriorated significantly. On July 8, because of perceived changes in his behavior, FMC-Springfield placed Loughner on suicide watch. On July 18, FMC-Springfield doctors determined that Loughner was a severe danger to himself and needed to be administered antipsychotic medication on an emergency basis, pursuant to 28 C.F.R. § 549.43(b).[4]

On July 22, 2011, we denied Loughner's emergency motion seeking to enforce the July 12 involuntary medication injunction. On August 11, 2011, Loughner filed an Emergency Motion for Prompt Post-Deprivation Hearing on Forced Medication, asking the district court to enjoin the emergency medication determination. After argument on August 26, 2011, the district court denied Loughner's motion. On August 29, 2011, Loughner filed a Notice of Appeal from that decision (No. 11-10432).

---

[4]The current regulation is located at 28 C.F.R. § 549.46(b)(1).

### 3. *Harper II*

On August 25, 2011, FMC-Springfield conducted a second *Harper* hearing ("*Harper II*"), pursuant to 28 C.F.R. § 549.46(a), and Dr. Tomelleri found continued medication justified based on Loughner's danger to himself. Although it appears that Loughner again requested Anne Chapman, one of his attorneys, to attend as a witness, she was contacted only after the hearing took place and then informed of Loughner's request. Getchell, again acting as Loughner's staff representative, filed an administrative appeal after Loughner declined to complete the form himself. On appeal, the Associate Warden determined that a statement from Loughner's requested witness, Ms. Chapman, should have been obtained before, and not after, the hearing. The appeal was therefore granted, pending a new hearing.

### 4. *Harper III*

FMC-Springfield conducted a third *Harper* hearing ("*Harper III*") on September 15, 2011, with Dr. Tomelleri again presiding. Loughner again requested Ms. Chapman as a witness. This time, Ms. Chapman was contacted and permitted to submit a written statement, which contained legal objections to the continuing involuntary medication. According to the Involuntary Medication Report, Dr. Tomelleri authorized involuntary medication based on a finding that Loughner was a danger to himself. In the Justification section of the report, Dr. Tomelleri cited the deterioration of Loughner's condition after psychotropic medication was discontinued in July. The report indicates that many of Loughner's most serious symptoms had receded since involuntary medication recommended pursuant to the July emergency order, but noted that Loughner "still exhibits a tendency toward motor restlessness and pacing, . . . cries frequently, and expresses intense feelings of guilt." Dr. Tomelleri noted that Dr. Pietz had expressed concern about Loughner's potential

for suicide, and at one point Loughner had asked her, "How did you know I was going to hang myself?"

The report noted Loughner's then-current medication regimen: 3mg of risperidone (antipsychotic), twice a day; 300 mg of buproprion XL (antidepressant); 1 mg of benztropine (anticholinergic to control side effects of antipsychotics), twice a day; 1 mg of clonazepam (anxiolytic), twice a day and 2 mg at bedtime. Finding that "psychotropic medication is the treatment of choice," Dr. Tomelleri noted that other measures did not address the fundamental problem or had no direct effect on the core manifestations of Loughner's mental condition. The report concluded that "[d]iscontinuation of current medications is virtually certain to result in an exacerbation of Mr. Loughner's illness as it did when medication was discontinued in July."

Getchell filed an appeal on Loughner's behalf. On the appeal form, Getchell relayed that Loughner wanted to appeal because he "do[esn't] do drugs." The Associate Warden upheld the involuntary medication determination, finding that "[m]edication is the least intrusive treatment for you at this time."

On September 23, 2011, Loughner filed an emergency motion in the district court to enjoin the involuntary medication authorized by the *Harper III* hearing. Loughner reiterated arguments raised in his prior involuntary medication challenges and, particular to this hearing, argued that BOP failed to find that the medication was necessary to treat his dangerousness and that his staff representative had provided inadequate assistance.

The district court denied Loughner's motion at a hearing on September 28, 2011, and again in a September 30 written order. During the hearing, the district court noted that the involuntary medication of Loughner is "predicated on the ground of dangerousness and really has nothing to do with his

competency," and thus, those with medical training and experience "who have interaction with Mr. Loughner on a daily basis are in the best position to assess whether he's a danger to himself and to assess his institutional needs." Status Hr'g Tr. 295, Sept. 28, 2011. In the written order, the district court reiterated that the "decision to medicate Mr. Loughner to prevent him from harming himself or others is best made by prison doctors following *administrative* procedures," and that the only issue for the court was whether the decision to medicate involuntarily was factually or procedurally deficient. Order Extending Restoration Commitment 5, Sept. 30, 2011. Finding no merit in Loughner's challenge to the adequacy of his staff representative, the court concluded that there was "no defect in the *Harper* hearing conducted on September 15." *Id.* at 6. The district court therefore denied the motion to enjoin Loughner's involuntary medication, and Loughner appealed (No. 11-10504).

## B. *Extension of Commitment*

Independent of the question whether Loughner could be involuntarily medicated because he was a danger to himself, the district court also addressed whether Loughner's commitment at FMC-Springfield could be extended to render him competent to stand trial. *See* 18 U.S.C. § 4241(d)(2). On August 22 and September 7, 2011, Dr. Pietz provided the district court with reports summarizing Loughner's hospital course at FMC-Springfield between May 27 and August 22, 2011; his current mental status and psychiatric treatment; and her opinion as to the likelihood that he could be restored to competency and the length of time it would likely take. Dr. Pietz reported that although Loughner presently remained incompetent to stand trial, she believed that "he w[ould] likely be[come] competent in the near future." She could not predict with any degree of certainty how much additional time was needed, but stated that "[h]istorically, most defendants reach competency within 8 months of their commitment." She then recommended a four-month extension for purposes of restor-

ing Loughner to competency.[5] Loughner objected to the extension of his commitment under 18 U.S.C. § 4241(d)(2).

On September 28, the district court conducted an evidentiary hearing to determine whether there was a substantial probability that Loughner could be restored to trial competency in a reasonable period of time. The government submitted exhibits and presented testimony from Dr. Pietz and Dr. James Ballenger, a clinical psychiatrist, to support its request for an extension of time. The defense submitted several exhibits, and cross-examined the government's witnesses, but did not call any witnesses of its own.

At the hearing, Dr. Pietz described her observations of Loughner and discussed the differences in his behavior and abilities before medication was administered and since being medicated. Dr. Pietz testified that, in her opinion, Loughner has not experienced any significant side effects from the medication. She acknowledged, however, that the medication may be contributing to the flat, expressionless affect Loughner displayed when medication resumed. Dr. Pietz noted that Loughner is clearly improving: he no longer responds to internal stimuli, his thoughts are more rational and organized, he is better able to concentrate and hold conversations, and he is becoming more aware of how others perceive him. Overall, Dr. Pietz testified that Loughner is still depressed, but that his cognitive abilities and functioning have improved, and he is more oriented, less delusional, and less obsessed. Based on these observations, Dr. Pietz testified that she believes Loughner can be restored to competency.

Dr. Ballenger, who had not examined Loughner, testified about the rates and likelihood of restoration generally and about the history and side effects of first- and second-

---

[5]Dr. Pietz explained at the September 28th hearing that she initially limited her extension request to four months because, in her experience, judges ordinarily granted extensions in four-month increments.

generation antipsychotic drugs. He testified that, in his experience, a very high percentage of people in Loughner's condition are restored to functional competency in the clinical setting within one year of being medicated, with most of the improvement occurring between months three and twelve. He explained that restoration was indicated by the fact that such patients are no longer as delusional, are more organized in thought, can focus and concentrate, and show improvement in taking care of themselves. Dr. Ballenger testified that he had reviewed Loughner's history and medication and, in his opinion, the current medication regimen is "highly appropriate." Dr. Ballenger concluded that, in light of Dr. Pietz's testimony and his own review of the records in this case, Loughner would likely be restored to trial competency within "two to six, eight more months."

The district court held that because the burden of proof for granting an extension of commitment under § 4241(d)(2) is "substantial probability," the government must demonstrate that Loughner is "likely" to attain competency within a reasonable time. Relying on reports submitted by Dr. Pietz before the hearing, and the testimony of Dr. Pietz and Dr. Ballenger at the hearing, the district court found that the evidence established that it is likely that Loughner will become competent to stand trial in this case and extended Loughner's commitment under § 4241(d)(2) for four months. Loughner appealed the district court decision, and that appeal is before us now (No. 11-10504).[6]

---

[6]On February 8, 2012, the district court extended Loughner's commitment for the purpose of competency restoration to June 7, 2012. Dr. Pietz reported to the district court that Loughner remains incompetent to stand trial but that he has made substantial progress. The government and Loughner filed a Joint Notice in which they indicated that they had no further evidence to present.

The extension of the commitment for competency restoration does not moot the issues in this appeal.

## II.   JURISDICTION

Before turning to the merits, we first address our jurisdiction over Loughner's appeals.

### A.   *The Basis for the District Court's Authority*

In No. 11-10504, Loughner appeals the district court's denial of his motion challenging FMC-Springfield's September 15 decision authorizing involuntary medication.[7] The district court's ruling, from which Loughner appealed, was a pretrial order. As the court overseeing Loughner's criminal prosecution, the district court has the authority to review Loughner's motion to enjoin forcible medication. *See* 18 U.S.C. § 3231. The district court's order "embodied legal conclusions related to [FMC-Springfield]'s administrative efforts to medicate [Loughner]; these efforts grew out of [Loughner]'s provisional commitment; and that provisional commitment took place pursuant to an earlier [district court] order seeking a medical determination about [Loughner]'s future competence to stand trial." *Sell*, 539 U.S. at 175 (citing *Riggins*, 504 U.S. 127; *Stack v. Boyle*, 342 U.S. 1, 6-7 (1951)). The district court's authority to review pretrial orders, therefore, gave it authority to review the involuntary medication of Loughner. *See Riggins*, 504 U.S. 127 (review-

---

[7]In No. 11-10339, Loughner appeals from the district court's denial of his motion challenging the June 14 involuntary medication decision, *Harper I*. Because *Harper I* is no longer operative, but the bulk of the legal arguments in that appeal apply also to the *Harper III* appeal, we have consolidated the cases and will consider the briefs, records, and arguments from both appeals as applied to the September 15 *Harper III* hearing—the currently operative involuntary medication order. No. 11-10339 is therefore dismissed as moot.

In No. 11-10432, Loughner appeals from the district court's denial of a prompt post-deprivation hearing after the emergency medication decision of July 18, 2011. Because that involuntary medication order is no longer operative, and because there is no relief that can be granted by this court, that appeal is dismissed as moot.

ing trial court's denial of defendant's motion to suspend administration of medication during trial); *United States v. Weston*, 206 F.3d 9 (D.C. Cir. 2000) (reviewing district court's order upholding BOP's decision to medicate involuntarily Weston); *Morgan*, 193 F.3d at 257-59 (reviewing district court's order authorizing forcible medication pursuant to the administrative determination after the district court rejected Morgan's motion to enjoin).

In No. 11-10504, Loughner appeals from the district court's order extending his commitment to FMC-Springfield. The district court has the authority to extend Loughner's commitment pursuant to 18 U.S.C. § 4241(d)(2).

B.  *Appellate Jurisdiction*

Ordinarily, an appellate court may hear appeals only from a district court's final decision. 28 U.S.C. § 1291. Under the collateral order doctrine, however, we may review a district court's preliminary or interim decision when it: "(1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." *Sell*, 539 U.S. at 176 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)) (internal quotation marks omitted); *see also Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

The district court's involuntary medication order falls within the collateral order doctrine.[8] First, the order conclu-

---

[8]We note that although Loughner cites 28 U.S.C. § 1292 as an alternative basis for jurisdiction, and initially filed a motion to enjoin in the district court, the parties appear to have addressed the issues as though this was a direct appeal from the involuntary medication order and not an appeal from a denial of a motion for an injunction. *See* 28 U.S.C. § 1292(a)(1) (providing appellate jurisdiction for denial of an injunction). Because direct appellate review through the collateral order doctrine does

sively determined the disputed question—whether there is any legal basis to medicate Loughner forcibly and whether Loughner has a legal right to a judicial hearing before involuntary medication. *See Sell*, 539 U.S. at 176; *Morgan*, 193 F.3d at 259. Second, the involuntary medication issue is important and completely separate from the merits of the action—i.e., whether Loughner is guilty or innocent of the crimes charged. *See Sell*, 539 U.S. at 176; *Morgan*, 193 F.3d at 259. Finally, the issue is effectively unreviewable because "[b]y the time of trial [Loughner] will have undergone forced medication—the very harm that he seeks to avoid." *Sell*, 539 U.S. at 176-77. We therefore have appellate jurisdiction, under the collateral order doctrine, to review the district court's involuntary medication order. *See United States v. Ruiz-Gaxiola*, 623 F.3d 684, 688 (9th Cir. 2010); *United States v. Grape*, 549 F.3d 591, 597 (3d Cir. 2008).

The district court's commitment order is also appealable under the collateral order doctrine. *See United States v. Friedman*, 366 F.3d 975, 978-79 (9th Cir. 2004). First, the order "conclusively determines [Loughner]'s 'present right to be at liberty prior to trial.'" *Id.* at 979 (quoting *United States v. Gold*, 790 F.2d 235, 239 (2d Cir. 1986)). Second, "the issue of involuntary commitment is completely separate from the issue of whether [Loughner] committed the crime with which he is charged," and is important because it implicates his freedom. *Id.* And finally, the order is effectively unreviewable because "nothing could recover for [Loughner] the time lost during his confinement." *Id.* at 979 (quoting *Gold*, 790 F.2d

---

not add another layer of review, and because this result is urged by Loughner and acceded to by the government, we have proceeded in that manner. *Cf. Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 32 (2008) (reviewing an injunction for abuse of discretion). We also note that it is not necessary for a defendant to go the route of an injunction to have the administrative *Harper* order reviewed in the district court. The district court's authority to review pretrial orders naturally extends to a review of pretrial medication orders.

at 239). Therefore, we have appellate jurisdiction to review the district court's commitment order as well.

## III.  THE INVOLUNTARY MEDICATION ORDERS

Loughner raises both substantive and procedural due process challenges to his involuntary medication.

> "[T]he substantive issue involves a definition of th[e] protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it. The procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance."

*Harper*, 494 U.S. at 220 (alterations in original) (quoting *Mills v. Rogers*, 457 U.S. 291, 299 (1982)). In other words, the substantive issue is "what factual circumstances must exist" before the government may involuntarily medicate Loughner; the procedural issue is whether the government's nonjudicial process used to determine the facts was sufficient. *See id.*[9]

---

[9]The dissent argues that we have addressed "the questions before us in the wrong order" because the "commitment decision is the currently operative one." Dissenting Op. at 2440 (emphasis omitted). Contrary to this claim, however, determining whether the involuntary medication order is currently operative—i.e., is not substantively or procedurally deficient—is a necessary predicate to determining whether Loughner's commitment for the purpose of competency restoration is justified. This is so because, as we explain, if Loughner must be involuntarily medicated because he is a danger to himself or others, then he will be medicated irrespective of whether that treatment will restore him to competency. *See Sell*, 539 U.S. at 181-82. We therefore first address whether Loughner's current involuntary medication order comports with constitutional requirements, and then address the extension of his commitment for the purposes of competency restoration.

The determination of the appropriate constitutional standard that governs a particular inquiry is a question of law subject to de novo review. *See Pierce v. Multnomah Cnty., Or.*, 76 F.3d 1032, 1042 (9th Cir. 1996). Factual findings are reviewed for clear error. *See United States v. Hinkson*, 585 F.3d 1247, 1260 (9th Cir. 2009) (en banc).

We first address the contours of Loughner's substantive due process right and then turn to his objections to the procedures afforded by 28 C.F.R. § 549.46.

A.  *Substantive Due Process Standard*

The parties dispute the proper substantive due process standard that applies when the government seeks to medicate forcibly a pretrial detainee on the grounds that he is a danger to himself or others. The government argues that the standard announced in *Harper* applies; Loughner argues that the heightened standards enunciated in *Riggins* and *Sell* should apply instead. As we explain below, neither *Harper* nor *Riggins* addresses the precise question at issue here. *Sell* suggests an answer, and we and every court of appeals to apply this framework has assumed that the Court answered the question in *Sell*. Consistent with *Sell*'s suggestion, we hold that the standard announced in *Harper* applies with equal force in the context of pretrial detainees.

1.  *Harper*, *Riggins*, and *Sell*

*Washington v. Harper* is the seminal involuntary medication case. 494 U.S. 210. It involved a prisoner's substantive and procedural due process challenge to a Washington state prison regulation authorizing the forcible medication of an inmate suffering from a mental disorder if he was "gravely disabled or pose[d] a likelihood of serious harm to himself, others, or their property." *Id.* at 215 (internal quotation marks omitted). Harper argued that, under the Due Process Clause, the State of Washington could not override his choice to

refuse antipsychotic drugs absent a finding of incompetence and substituted judgment that, if he were competent, he would consent to drug treatment. *Id.* at 222. The Court framed the substantive issue as: "what factual circumstances must exist before the State may administer antipsychotic drugs to the prisoner against his will." *Id.* at 220.

The Court began its analysis by recognizing that inmates possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id.* at 221-22. This liberty interests stems from both the drugs' intended mind-altering effects and from their "serious, even fatal, side effects"—including acute dystonia ("severe involuntary spasm of the upper body, tongue, throat, or eyes"), akathisia "(motor restlessness, often characterized by an inability to sit still)," neuroleptic malignant syndrome "(a relatively rare condition which can lead to death from cardiac dysfunction)," and tardive dyskinesia ("a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face").[10] *Id.* at 229-30.

---

[10]We note that some of the Court's concerns in *Harper* have been lessened to some extent by significant pharmacological advances. The drugs at issue in *Harper*—Trialafon, Haldol, Prolixin, Taractan, Loxitane, Mellaril, and Navane, 494 U.S. at 214 n.1—were first-generation antipsychotics. As Dr. Ballenger explained at Loughner's commitment hearing, the "almost miraculous promise of second-generation [medications] is people still get well, but with markedly less" side effects: the frequency of tardive dyskinesia is "[a] fifth or one-tenth of what it was before"; neuroleptic malignant syndrome is "vanishingly rare"; extrapryamidal effects (Parkinson-like disorders) that had an incidence rate of 75% with Haldol occur "very rarely," at the same level as with a placebo; and "akathisia is also markedly less frequent." See *Grape*, 549 F.3d at 596 (citing testimony from a FMC-Springfield psychiatrist that "[t]hese side effects, especially neuroleptic malignant syndrome, EPS or stiffness, and tardive dyskinesia, which could be permanent, are less common in second-generation antipsychotics than in first-generation medicines such as haloperidol"); *United States v. Evans*, 404 F.3d 227, 233-34 (4th Cir. 2005) (discussing the involuntary medication report's conclusion that "second-generation, or atypical antipsychotic medications" have a reduced risk of side effects).

The Court recognized, however, that an inmate's liberty interest in avoiding unwanted medication must be "defined in the context of the inmate's confinement." *Id.* at 222. Specifically, the Court noted "the need to reconcile our longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration." *Id.* at 223-24. To accommodate this need, the Court reiterated that "the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.' " *Id.* at 223 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Among the factors that determine the reasonableness of a prison regulation, the Court found three particularly relevant in the context of involuntary medication: (1) "there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "a court must consider the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (3) "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* at 224-25 (internal quotation marks omitted).

**[1]** Applying these factors to the Washington regulation, the Court concluded that the policy comported with constitutional requirements. *Id.* at 225. Having deprived inmates of their liberty, the State has an obligation to provide prisoners with medical treatment consistent with both the inmates' and the institution's needs. *Id.* Thus, when the root cause of the inmate's threat is his mental disability, "the State's interest in decreasing the danger to others necessarily encompasses an interest in providing him with medical treatment for his illness." *Id.* at 225-26. Therefore, the Court determined that involuntary medication is a rational means of furthering the State's legitimate objectives: the interest in "ensuring the safety of prison staffs and administrative personnel," and the

"duty to take reasonable measures for the prisoners' own safety." *Id.* at 225. Finally, the Court found that the government was not required to adopt the alternative means proffered by Harper (seclusion and physical restraints) because Harper failed to demonstrate that they were "acceptable substitutes for antipsychotic drugs, in terms of either their medical effectiveness or their toll on limited prison resources." *Id.* at 226-27. Accordingly, the Court held that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227.

In *Riggins*, the Court addressed a slightly different set of interests: a criminal defendant's challenge to his conviction on the grounds that Nevada forced him to take antipsychotic drugs during his trial. 504 U.S. 128. After being taken into custody, Riggins began voluntarily taking Mellaril because he was hearing voices and having trouble sleeping. *See id.* at 129. As preparations for trial went forward, Riggins asked the court to suspend the medication until the end of the trial, arguing that the drugs infringed upon his freedom and would deny him due process because of their effect on his demeanor and mental state during trial. *See id.* at 130. The court held an evidentiary hearing, in which three different doctors questioned the need for continued administration of the drugs, and then denied Riggins's motion, giving no indication for the court's rationale. *See id.* at 131-32. Riggins continued to be medicated throughout the trial. *See id.* at 132.

In reviewing the forced medication of Riggins during trial, the Supreme Court began from the premise that "[u]nder *Harper*, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness." *Id.* at 135. Noting that the "Fourteenth Amendment affords *at least as much protection* to persons the State detains for trial," the Court

held that the government must show both the need for and the medical appropriateness of antipsychotic medication. *Id.* (emphasis added).

The Court denied that *Harper* had determined the full constitutional protections of *pretrial* detainees. Admitting that it had "not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings," the Court suggested that "Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others." *Id.* The Court explained, however, that it did not have "occasion to finally prescribe such substantive standards" because the district court's involuntary medication order made no determination of the need for the medication and no findings about reasonable alternatives. *Id.* at 136. In other words, "[t]he [district] court did not acknowledge the defendant's liberty interest in freedom from unwanted antipsychotic drugs." *Id.* at 137. The Court observed that this failure may have impaired Riggins's constitutionally protected trial rights—including "the substance of his own testimony, his interaction with counsel, or his comprehension at trial"—and concluded that there was no basis for finding that, if Riggins had been affected by his involuntary medication, any prejudice was justified. *Id.* at 137-38. The Court accordingly reversed the Nevada Supreme Court's decision upholding Riggins's conviction and remanded for further proceedings. *Id.* at 138.

**[2]** Most recently, in *Sell*, the Supreme Court set out the substantive standards for when the government may administer antipsychotic drugs involuntarily to a mentally ill criminal defendant to render him competent for trial. 539 U.S. 166. The Court adopted a more demanding standard for medicating a defendant facing trial to render that defendant competent than it required in *Harper* for medicating a convicted inmate

to render that inmate nondangerous. The Court held that the government may forcibly medicate a mentally ill pretrial detainee for the purpose of rendering him competent to stand trial, but only if a court determines that there are important governmental trial-related interests at stake; that involuntary medication will significantly further these government interests, without causing side effects that will interfere significantly with the defendant's fair trial rights; that the medication is necessary to further the government's interests, taking into account less intrusive alternatives; and that the administration of the antipsychotic drugs is medically appropriate, i.e., in the defendant's best medical interest. *Id.* at 180-81; *see also Witt v. Dep't of Air Force*, 527 F.3d 806, 818 (9th Cir. 2008) (referring to *Sell* as an application of heightened scrutiny in the substantive due process context).

**[3]** *Sell* came with an important caveat, however. "A court need not consider whether to allow forced medication for [trial competency purposes], if forced medication is warranted for a *different* purpose, such as the purposes set out in *Harper* related to the individual's dangerousness." *Id.* at 181-82. The Court noted that there are three reasons for determining whether forced medication can be justified on alternative grounds before turning to the trial competency question: First, "the inquiry into whether medication is permissible . . . to render an individual nondangerous is usually more 'objective and manageable' than the inquiry into whether medication is permissible to render a defendant competent." *Id.* at 182 (quoting *Riggins*, 504 U.S. at 140 (Kennedy, J., concurring)). Second, "courts typically address involuntary medical treatment as a civil matter, and justify it on these alternative, *Harper*-type grounds." *Id.* Finally, if medication is authorized on alternative grounds, "the need to consider authorization on trial competence grounds will likely disappear." *Id.* at 183. The Court explained why the purpose of the involuntary medication is relevant:

> Whether a particular drug will tend to sedate a defendant, interfere with communication with coun-

sel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence, but not necessarily relevant when dangerousness is primarily at issue.

*Id.* at 185 (citation omitted).

### 2. Post-*Sell* Cases

The parties dispute whether the Supreme Court's precedent answers the question in this case: what substantive due process standard must the government satisfy to medicate involuntarily a pretrial detainee on the ground that he is dangerous? The government argues that, because Loughner was being medicated for dangerousness, he may be medicated following a *Harper* hearing, and that *Sell* approved the use of "*Harper*-type grounds" for medicating pretrial detainees. *See Sell*, 539 U.S. at 182, 183. Loughner responds that *Harper* addressed involuntary medication for convicted inmates, not pretrial detainees, and that *Riggins* requires that the government demonstrate that a pretrial detainee's "treatment with antipsychotic medication [i]s medically appropriate and, considering less intrusive alternatives, essential for the sake of [the pretrial detainee]'s own safety or the safety of others." *Riggins*, 504 U.S. at 135.

The Court's cases have not addressed the issue directly. The Court in *Sell* seemed to assume, however, that a *Harper* hearing would be sufficient to medicate involuntarily a pretrial detainee on dangerousness grounds. More importantly, we have made the same assumption in our prior discussions of *Harper*, *Riggins*, and *Sell*. Finally, post-*Sell*, every court of appeals to have considered the application of *Harper* in the pretrial detainee context has made the same assumption.

The core of Loughner's argument comes from two statements in *Riggins*. First, the Court was careful to acknowledge

UNITED STATES V. LOUGHNER

that *Harper* involved a convicted prisoner: "Under *Harper*, forcing antipsychotic drugs *on a convicted prisoner* is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The Fourteenth Amendment affords *at least as much protection* to persons the State detains for trial." *Riggins*, 504 U.S. at 135 (emphasis added). That parsing of *Harper* was followed with this observation:

> Although we have not had occasion to develop substantive standards for judging forced administration of such drugs *in the trial or pretrial settings*, Nevada certainly would have satisfied due process if the prosecution had demonstrated . . . that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others.

*Id.* (emphasis added). Nothing in the holding of *Sell* fills this gap, except for the Court's significant aside that "if forced medication is warranted for a *different* purpose, such as the purposes set out in *Harper* related to the individual's dangerousness," then the district court need not conduct a *Sell* hearing to determine whether a pretrial detainee may be medicated to render him competent to stand trial. *Sell*, 539 U.S. at 181-82. When the Court later referred to "*Harper*-type grounds," *id.* at 182, and failed to renew its disclaimer that it had not decided the *Harper* question for pretrial detainees,[11]

---

[11]Furthermore, in *Sell*, the Court observed that FMC-Springfield and the magistrate judge held dangerousness hearings "applying standards roughly comparable to those set forth here and in *Harper*." *Sell*, 539 U.S. at 183. The magistrate judge approved Sell's medication on dangerousness grounds. Although the district court found that conclusion clearly erroneous, the court of appeals agreed, and the government did not appeal the finding, the Supreme Court noted that "[i]f anything, the record before us . . . suggests the contrary," before proceeding on the "hypothetical assumption" that Sell was not dangerous. *Id.* at 184-85. If the Court had any remaining doubts about the nature of the hearings, it had ample opportunity to renew its disclaimer in *Riggins* or otherwise question the standards used by FMC-Springfield and the magistrate judge.

we and other circuits believed that the Court had, indeed, decided just such a question.

We first addressed the Supreme Court's trilogy with respect to a pretrial detainee in *United States v. Rivera-Guerrero*, 426 F.3d 1130 (9th Cir. 2005). Rivera-Guerrero was charged with illegal reentry. *See id.* at 1134. After he was found incompetent to stand trial, FMC-Springfield requested an order allowing it to medicate Rivera-Guerrero to restore his competence to stand trial. *See id.* The magistrate judge held a *Sell* rather than a *Harper* hearing and determined that Rivera-Guerrero could be medicated. *See id.* at 1134-35. We reversed the order on appeal on the grounds that a pretrial involuntary medication decision could not be delegated to a magistrate judge. *See id.* at 1136. Following the remand, FMC-Springfield began involuntarily medicating Rivera-Guerrero on an emergency basis. The district court thereafter issued an opinion adopting the recommendations of the magistrate judge—a nearly identical justification as the order we previously vacated. *See id.*

We began our discussion by noting that "*Sell* orders are disfavored. The Supreme Court clearly intends courts to explore other procedures, such as *Harper* hearings *(which are to be employed in the case of dangerousness)* before considering involuntary medication orders under *Sell*." *Id.* at 1137 (emphasis added). Although we reversed for a procedural error in the *Sell* proceedings, we noted that because of Rivera-Guerrero's involuntary medication on dangerousness grounds and confinement for more than the permissible period of time, "on remand, conducting a *Sell* inquiry no longer constitutes the appropriate procedure." *Id.* at 1143. We instructed the district court to order FMC-Springfield to report on Rivera-Guerrero's medical status. "If the FMC reports that Rivera-Guerrero has been rendered competent to stand trial as a result of its administration of the medication, and the district court accepts that assertion, then the district court may proceed with the criminal trial . . . ." *Id.* at 1144.

In *United States v. Hernandez-Vasquez*, 513 F.3d 908 (9th Cir. 2008), we addressed a slightly different circumstance. The government had charged Hernandez-Vasquez, like Rivera-Guerrero, with illegal reentry. *See id.* at 911. After the district court found Hernandez-Vasquez incompetent, he was transferred to FMC-Springfield where the government requested that he be medicated to render him competent to stand trial; in the alternative, the government asked that Hernandez-Vasquez be evaluated for dangerousness. *See id.* at 912. The district court conducted a *Sell* hearing and granted the government's motion to medicate Hernandez-Vasquez to render him competent for trial. *See id.* On appeal, we noted that "a *Sell* inquiry is independent of the procedure that allows involuntary medication of dangerous inmates under *Harper*." *Id.* at 913. We addressed the question of whether "the district court had an obligation to apply *Harper* and make a dangerousness inquiry before proceeding under *Sell*," and held that "[i]f a district court does not conduct a dangerousness inquiry under *Harper*, it should state for the record why it is not doing so." *Id.* at 914. We concluded that the district court "should take care to separate the *Sell* inquiry from the *Harper* dangerousness inquiry and not allow the inquiries to collapse into each other." *Id.* at 919.

**[4]** We suppose that a close reading of these cases might yield a conclusion that our statements regarding *Harper* are dicta. But given the extensive nature of our discussions, our lack of reservation about applying *Harper* to pretrial detainees, and our instructions on remand to conduct "the *Harper* dangerousness inquiry," *id.*, there is little doubt that we believe that the standards set forth in *Harper* apply to inmates being held by the government, whether they are awaiting trial or are serving a sentence of incarceration. *See Ruiz-Gaxiola*, 623 F.3d at 689 (referring to the magistrate judge ordering "the government to conduct an administrative hearing pursuant to *Harper*" prior to considering an involuntary medication order under *Sell* for a pretrial detainee "[d]ue in part to our admonition that '*Sell* orders are disfavored' ").

Even if we were inclined to reweigh the factors considered by the Supreme Court in *Harper* in the context of a convicted prisoner, we would arrive at the conclusion that *Harper* applies to pretrial detainees as well. Two points are sufficient. First, we recognize that the most important factor for determining the appropriate level of scrutiny is the purpose of the involuntary medication, not the inmate's criminal status. *See United States v. Baldovinos*, 434 F.3d 233, 240 (4th Cir. 2006) ("[T]he Court indicated that the determination of which principles apply—those of *Harper* or those of *Sell*—depends on the purpose for which the Government seeks to medicate the defendant."); *United States v. Brandon*, 158 F.3d 947, 957 (6th Cir. 1998) ("*Harper*'s rationale is based upon the premise that if the government's action focuses primarily on matters of prison administration, then the action is proper if reasonably related to a legitimate penological interest, even if it implicates fundamental rights."). If the government seeks to medicate involuntarily a pretrial detainee on trial competency grounds, that is a matter of trial administration and the heightened standard announced in *Sell* applies. *See Sell*, 539 U.S. at 183. When dangerousness is a basis for the involuntary medication, however, as is the case with Loughner, the concerns are the orderly administration of the prison and the inmate's medical interests. *See Harper*, 494 U.S. at 222-25; *Baldovinos*, 434 F.3d at 240; *Brandon*, 158 F.3d at 957.

**[5]** Second, although we recognize that in certain contexts there are important differences—differences of constitutional magnitude—between pretrial detainees and convicted detainees, *see Bell v. Wolfish*, 441 U.S. 520, 537 (1979) ("This Court has recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may."); *Friedman v. Boucher*, 580 F.3d 847, 853-58 (9th Cir. 2009) (holding that suspicionless, warrantless searches of pretrial detainees that do not contribute to prison security are unconstitutional, and distinguishing cases upholding similar searches of convicted detainees), those differences largely disappear when

the context is the administration of a prison or detention facility. As the Court stated in *Bell*,

> [t]he fact of confinement as well as the legitimate goals and policies of the penal institution limits . . . retained constitutional rights. There must be a mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application. *This principle applies equally to pretrial detainees and convicted prisoners.*

441 U.S. at 546 (1979) (emphasis added) (citations omitted) (internal quotation marks omitted); *see Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 973-74 & nn.10, 11 (9th Cir. 2010) (en banc) ("We have never distinguished between pretrial detainees and prisoners in applying the *Turner* test, but have identified the interests of correction facility officials responsible for pretrial detainees as being 'penological' in nature."); *United States v. Hearst*, 563 F.2d 1331, 1345 n.11 (9th Cir. 1977) ("All legitimate intrusive prison practices have basically three purposes: the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners. The first two interests are implicated regardless of the status of the prisoner. The third, of course, applies only to prisoners already convicted of a crime. Accordingly, a pretrial detainee may assert his status as a shield against intrusive practices aimed solely at rehabilitation but not against practices aimed at security and discipline." (citations omitted) (internal quotation marks omitted)). So long as Loughner is a pretrial detainee, and lawfully held, his rights are limited by the facility's legitimate goals and policies, and his dangerousness to himself or to others may be judged by the same standard as convicted detainees. *See Harper*, 494 U.S. at 224 ("We made quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights.").

Finally, we observe that, post-*Sell*,[12] every court of appeals to have considered the interplay between *Harper* and *Sell*—a context that necessarily implicates pretrial detainees only—has similarly assumed that *Harper* is the appropriate standard for measuring whether a pretrial detainee may be involuntarily medicated because of dangerousness. *See Grape*, 549 F.3d at 599 ("We do not reach consideration of the four-factor *Sell* test unless an inmate does not qualify for forcible medication under *Harper*, as determined at a *Harper* hearing generally held within the inmate's medical center."); *United States v. Green*, 532 F.3d 538, 545 n.5 (6th Cir. 2008) ("The *Sell* standard applies when the forced medication is requested to restore competency to a pretrial detainee and the pretrial detainee is not a danger to himself or others. When the pretrial detainee is a potential danger to himself or others, the *Harper* standard is used."); *United States v. White*, 431 F.3d 431, 435 (5th Cir. 2005); *United States v. Morrison*, 415 F.3d 1180, 1186 (10th Cir. 2005) ("[T]he central role of dangerousness in the *Sell* inquiry in this case calls out for proceeding under *Harper* first."); *Evans*, 404 F.3d at 235 n.3 ("The Supreme Court has outlined different tests for when the government may involuntarily medicate an individual, depending on whether the medication is for purposes of prison control or prisoner health on the one hand, *see* [*Harper*, 494 U.S. at 227], or, on the other hand, for the purpose of prosecuting an incompetent defendant, *see Sell*[, 539 U.S. at 166]."); *see also Morgan*, 193 F.3d at 262-63 (pre-*Sell* case holding that "[u]nder *Harper*, due process permits institutional medical personnel to forcibly treat a pretrial detainee with antipsycho-

---

[12]We note that in *Weston*, 206 F.3d 9, a pre-*Sell* decision, the panel questioned whether, in light of *Riggins*, *Harper* applied to pretrial detainees. *Compare id.* at 14 (Henderson, J., concurring) ("[T]he applicable standards for reviewing an institution's medical/safety determination appear to me, at least, to be the same for a detainee as for a convicted inmate."), *with id.* at 17 (Rogers, J., concurring) ("The Supreme Court may ultimately articulate a standard for pretrial detainees that is different from the one applied in *Harper* to a prison inmate . . . ."). So far as we can determine, the D.C. Circuit has not revisited the question after *Sell*.

tic medication once they conduct the type of administrative proceeding the State of Washington employed").

**[6]** If there was any remaining doubt in our cases about the proper standard, we now hold that when the government seeks to medicate a detainee—whether pretrial or post-conviction—on the grounds that he is a danger to himself or others, the government must satisfy the standard set forth in *Harper*. "[T]he Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Harper*, 494 U.S. at 227.

### 3. The Standard Applied

Having decided that *Harper* supplies the standard, we can easily address Loughner's argument. Loughner argues that FMC-Springfield applied the wrong standard. Based on the assumption that *Riggins* governs here, Loughner claims that FMC-Springfield failed to demonstrate that forcibly medicating him was (1) medically appropriate and, (2) "considering less intrusive alternatives, essential for the sake of [Loughner]'s own safety or the safety of others." *Riggins*, 504 U.S. at 135.

**[7]** For the reasons we have explained, the *Riggins* standard does not govern. We are satisfied that FMC-Springfield used the proper standard from *Harper*. At the *Harper III* hearing, Dr. Tomelleri heard the evidence from Loughner's treating psychiatrist and psychologist and concluded that Loughner was a danger to himself, and that "[i]nvoluntary medication is . . . in the patient's best medical interest." Dr. Tomelleri first noted that Loughner "has a well-documented history of persistent manifestations of schizophrenia" and that following discontinuation of a previous medication order, Loughner's condition deteriorated. He further explained that "[p]sychotropic medication is the treatment of choice for con-

ditions such as Mr. Loughner is experiencing" and that "[d]iscontinuation of current medications is virtually certain to result in an exacerbation of Mr. Loughner's illness as it did when medication was discontinued in July [2011]." Even though the facility was not required to demonstrate that there were no less intrusive alternatives available or that medication was "essential," *Harper*, 494 U.S. at 226-27, Dr. Tomelleri did note that other measures were inadequate because they failed to "address the fundamental problem" or "core manifestations of the mental illness." Antipsychotics are "one of the most effective means of treating and controlling a mental illness likely to cause violent behavior"; the fact that there might be alternative means for rendering Loughner temporarily harmless (minor tranquilizers, seclusion and restraints), "do[es] not demonstrate the invalidity of the [government]'s policy" of treating the underlying mental disorder. *Harper*, 494 U.S. at 226. We reject Loughner's claim that FMC-Springfield failed to apply the appropriate substantive standard.

B. *Procedural Objections*

Loughner raises a number of challenges to the procedures used by FMC-Springfield to determine that he was a danger to himself or others and should be involuntarily medicated. We begin with a discussion of 28 C.F.R. § 549.46, which sets forth BOP's "[p]rocedures for involuntary administration of psychiatric medication." Then we address Loughner's general or facial challenges to these regulations. We then turn to Loughner's as-applied challenges to the *Harper III* hearing held by FMC-Springfield.

1. BOP's Regulation, 28 C.F.R. § 549.46

[8] Like the regulation at issue in *Harper*, § 549.46 requires that "[w]hen an inmate is unwilling or unable to provide voluntary written informed consent for recommended psychiatric medication, the inmate will be scheduled for an

administrative hearing." 28 C.F.R. § 549.46(a). The regulation requires twenty-four-hour written notice of the hearing and a written "explanation of the reasons for the psychiatric medication proposal." *Id.* § 549.46(a)(2). The inmate has the right to appear, present evidence, have a staff representative, request witnesses at the hearing, and request that his witnesses be questioned by either his staff representative or the hearing officer. If the inmate does not request a staff representative, or requests a staff representative with insufficient experience, the facility administrator must appoint a qualified staff representative. *See id.* § 549.46(a)(3). The hearing officer must be a psychiatrist who is not the attending psychiatrist and who is not involved in the diagnosis or treatment of the inmate, thus ensuring that there is an independent decision maker. *See id.* § 549.46(a)(4). The inmate's treating psychiatrist must attend and present background information and clinical data relative to the inmate's need for antipsychotic medication. *See id.* § 549.46(a)(6). The hearing officer determines

> whether involuntary administration of psychiatric medication is necessary because, as a result of the mental illness or disorder, the inmate is dangerous to self or others, poses a serious threat of damage to property affecting the security or orderly running of the institution, or is gravely disabled (manifested by extreme deterioration in personal functioning).

*Id.* § 549.46(a)(7). If the hearing officer determines that medication is necessary, the inmate has the right to appeal within twenty-four hours, and the staff representative must assist in preparing and submitting the appeal. *See id.* § 549.46(a)(8). Unless there is a "psychiatric emergency," no medications may be administered if the inmate appeals the decision. *See id.* § 549.46(a)(9), (b)(1). The appeal will ordinarily be decided within twenty-four hours. *See id.* § 549.46(a)(9).

These regulations are substantially equivalent to the Washington procedures approved in *Harper*. *See Harper*, 494 U.S.

at 215-16. We notice two differences, however, between the BOP's regulations and Washington's procedures. First, the Washington policy contained a periodic review requirement. *See id.* at 216. Second, the Washington policy required that the hearing be held before a three-person "special committee" comprised of a psychiatrist, a psychologist, and the Associate Superintendent of the facility. *See id.* at 215. It is not clear that either of these procedures are constitutionally required. *Harper* simply found them to be constitutionally sufficient.

These differences do not render § 549.46 constitutionally infirm. First, a periodic review requirement is unnecessary in the context of pretrial detainees because a pretrial detainee's status is by definition temporary—after the trial the defendant will either become a convicted inmate or a free person. Additionally, the involuntary medication order will often be part of either a determination of competency, which is limited to four months, 18 U.S.C. § 4241(d)(1), or a restoration to competency, which is limited to "an additional reasonable period of time," *id.* § 4241(d)(2). The involuntary medication order is limited precisely because of the inmate's status, thus diminishing the need for periodic review. *Cf. Harper*, 494 U.S. at 216 n.4 (noting that the periodic review requirement of the Washington policy was amended to require bi-weekly reports to the Department of Corrections medical director and a new hearing at the end of 180 days).

Second, unlike the procedures approved in *Harper*, BOP provides for a single hearing officer, rather than the three-person committee provided in Washington's policy. *See* 28 C.F.R. § 549.46(a)(4). We do not think a multi-member committee is constitutionally compelled. Indeed, the Court in *Harper* focused only on the fact that a second psychiatrist—as a member of the special committee—was reviewing the medications prescribed by the inmate's treating psychiatrist. *See Harper*, 494 U.S. at 222 ("[T]he fact that the medication must first be prescribed by a psychiatrist, and then approved by a reviewing psychiatrist, ensures that the treatment in question

will be ordered only if it is in the prisoner's medical interests
. . . ."). BOP's decision to provide a hearing conducted by a
single non-treating psychiatrist is thus consistent with the
Court's analysis in *Harper*.

We now turn to Loughner's challenges to § 549.46 gener-
ally and then to his particular challenges to his *Harper III*
hearing.

## 2. Loughner's General Challenges to 28 C.F.R. § 549.46

Loughner raises three claims. First, he argues that, as a pre-
trial detainee, he is entitled to a judicial, rather than an admin-
istrative, determination of his dangerousness and the need for
medication. Second, he argues that the government's burden
of proof is clear and convincing evidence. Third, he argues
that he is entitled to be represented at the hearing by counsel.
We think that *Harper* largely forecloses these arguments.

### a. Judicial hearing

**[9]** The Court in *Harper* rejected the argument that an
involuntary medication decision based on dangerousness
grounds must be made by a judicial decision maker after a
judicial hearing. Indeed, the Court concluded that "an
inmate's interests are adequately protected, and perhaps better
served, by allowing the decision to medicate to be made by
medical professionals rather than a judge." *Id.* at 231.

**[10]** Nevertheless, citing the "rhythmically insistent pulse
of *Sell*'s refrain," the dissent argues that "*Sell*[ ] and its prog-
eny require *the district court* to determine whether a pretrial
detainee may be involuntarily drugged on dangerousness
grounds." Dissenting Op. at 2442-46. But the passage that the
dissent relies on, and our subsequent cases dealing with the
*Sell/Harper* distinction, is premised on the assumption that
the involuntary medication are being sought "solely for trial
competence purposes." *Sell*, 539 U.S. at 180. When this is the

case, *Sell* clearly mandates that the district court, using a higher substantive standard, make the involuntary medication determination. The dissent reads *Sell* to mean that the district court, applying the demanding standard of *Sell*, may consider whether there might be alternative means (dangerousness) of justifying the involuntary medication. Because the issue of dangerousness could be raised before the court at that point, it would be the district court that determines whether medication might be justified on *Harper*-type grounds. The dissent thus concludes that whenever "the government's ultimate aim is restoration of competency" the "court must *itself* address the involuntary medication issue." Dissenting Op. at 2442-43.

**[11]** The dissent reads too much into *Sell*. *Sell* tells us that "[a] court need not consider whether to allow forced medication for [trial competency purposes], if forced medication is warranted for . . . the purposes set out in *Harper*." *Sell*, 539 U.S. at 181-82. In such a case, "the need to consider authorization on trial competence grounds will likely disappear." *Id.* at 183. When read in connection with the analysis in *Harper*, *Sell* provides that a district court *may* authorize involuntary medication on dangerousness grounds, using the substantive standard outlined in *Harper*, not that the district court *must* make this determination. *Sell* thus incorporates *Harper* into its structure, but nothing in *Sell* requires the district court to revisit the dangerousness inquiry de novo.

Loughner offers a slightly different perspective. He argues that there would be substantial added value to having judicial decision makers and a judicial hearing in the pretrial context because the administrative review is not very "probing," the prison doctors are charged with conflicting goals, and the medical expertise of the judicial decision maker would be advanced by allowing the defense to present additional evidence at a judicial hearing.

Nothing about Loughner's status as a pretrial detainee renders administrative review more or less "probing," or affects

the medical expertise of a potential judicial decision maker. *Harper* rejected these claims, and they are equally unpersuasive when applied to pretrial detainees. *See id.* at 233 ("A State may conclude with good reason that a judicial hearing will not be as effective, as continuous, or as probing as administrative review using medical decisionmakers.").

**[12]** The structural conflict of interest argument was also considered and rejected in *Harper*. *See id.* at 233-34 (noting that prior cases involving similar deprivations of liberty have approved the use of internal decision makers *(citing Vitek v. Jones*, 445 U.S. 480, 496 (1980); *Parham v. J.R.*, 442 U.S. 584, 613-16 (1979); *Wolff v. McDonnell*, 418 U.S. 539, 570-71 (1974))). In fact, the Court has made clear that "it is only by permitting persons connected with the institution to make these decisions that courts are able to avoid 'unnecessary intrusion into either medical or correctional judgments.'" *Id.* at 235 (quoting *Vitek*, 445 U.S. at 496). The dissent disagrees, pointing to possible confusion in this particular case as to what FMC-Springfield's role was in administering involuntary medication, and arguing that courts may be better situated to render objective decisions in the pretrial context. Dissenting Op. at 2451-53. We maintain, however, that the decision to medicate involuntarily a pretrial detainee based on dangerousness grounds is a penological and medical decision that should be made by the medical staff. Although it is conceivable that a situation might arise in which a conflict of interest exists, "we will not assume that physicians will prescribe these drugs for reasons unrelated to the medical needs of the patients." *Harper*, 494 U.S. at 222 n.8. Although the medical staff may have an interest in curing the patient or restoring competency, even when charged merely with determining if restoration is possible, we trust that these professionals will act within the pretrial detainee's and prison's best interests, within the limits of their charge. Therefore, any conflict of interest argument should be dealt with on a case-by-case basis and not deemed a bar to leaving the involuntary medication decision to the prison medical staff.

Finally, Loughner contends that a judicial determination will not be unduly burdensome because a pretrial detainee is already subject to ongoing judicial proceedings. Additional judicial proceedings, however, always have costs. Judicial determinations of medical issues occasion unnecessary intrusion into both medical and custodial judgments, *see id.* at 235; *see also* Brief for Am. Psychiatric Ass'n & Am. Acad. of Psychiatry & the Law as Amici Curiae Supporting Affirmance ("APA Br.") at 24, and "divert scarce prison resources, both money and the staff's time, from the care and treatment of mentally ill inmates," *Harper*, 494 U.S. at 232; *see Parham*, 442 U.S. at 606; APA Br. at 24-25 (discussing increase of judicial resources after Massachusetts began requiring state courts to review involuntary medication orders). This is so regardless of whether the inmate has already been through the judicial process or is still in the pretrial phase.

The Due Process Clause requires that we measure the cost of additional procedures against the risk of error in the existing procedures and the private interest at stake. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Thus, the mere fact that a party can design a set of more expansive procedures does not entitle him to such process. The fact that Loughner can conceive of *more* process does not entitle him to it as the process that is *due*. Loughner has made no argument beyond his own comfort level to demonstrate the superiority of judicially directed hearings over medically directed hearings. He has offered no explanation for why there is an unacceptable risk of error "by allowing the decision to medicate to be made by medical professionals rather than a judge." *Harper*, 494 U.S. at 231.

**[13]** Thus, the Due Process Clause does not require a judicial determination or a judicial hearing before a facility authorizes involuntarily medication.

### b.   Clear, Cogent, and Convincing Standard

**[14]** Loughner next argues that because he is a pretrial detainee, the Due Process Clause requires that the determina-

tion to medicate forcibly be made by clear and convincing evidence. *Harper* held that a "clear, cogent, and convincing" standard "is neither required nor helpful when medical personnel are making the judgment." *Id.* at 235. Because it is the type of decision to be made and not a person's status as a pretrial inmate that is relevant to this factor, we reject the contention that the Due Process Clause requires a heightened standard of proof.

### c. Representation by Counsel

**[15]** Loughner argues that a pretrial detainee is entitled to counsel at the involuntary medication hearing. This argument is largely an outgrowth of his argument for a judicial hearing. In any event, we disagree that Loughner is entitled to counsel in a BOP administrative hearing.[13] It is not an inmate's trial posture that governs the need for lawyers; instead, it is the nature of the judgment required. The decision to medicate involuntarily based on dangerousness grounds is a quintessential medical judgment, and in rejecting the necessity of counsel, *Harper* noted that " '[i]t is less than crystal clear why *lawyers* must be available to identify possible errors in *medical* judgment.' " *Id.* at 236 (quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 330 (1985)). *Harper* then defined what would be sufficient representation: "the provision of an independent lay adviser who understands the psychiatric issues involved is sufficient protection." *Id.* We agree that this is the only requirement in the pretrial context as well.

### 3. Loughner's As-applied Challenges to His *Harper III* Hearing

We next address whether the *Harper III* hearing, under which Loughner is currently being forcibly medicated, com-

---

[13]We have some additional concerns with how, short of having legal counsel, a detainee's interests are represented at the dangerousness hearing. These are addressed *infra* at Part III.B.3.d.

plied with the procedural protections of 28 C.F.R. § 549.46. Loughner argues that even if *Harper* applies, his rights were violated, for four reasons: First, the decision maker failed to demonstrate that he was dangerous; second, FMC-Springfield failed to specify the course of treatment, that is, the types or dosages of drugs that may be administered to him; third, the BOP decision makers were not actually independent; and, finally, Loughner was not provided meaningful representation at the hearings.

Although no statute affirmatively grants an inmate the right to obtain judicial review of a *Harper*-dangerousness hearing, the court that authorized commitment in the first place pursuant to 18 U.S.C. § 4241(d) has jurisdiction over the involuntary medication order, and we have appellate jurisdiction under the collateral order doctrine. In reviewing the order, we recognize that "deference . . . is owed to medical professionals who have the full-time responsibility of caring for mentally ill inmates . . . and who possess, as courts do not, the requisite knowledge and expertise to determine whether the drugs should be used in an individual case." *Harper*, 494 U.S. at 230 n.12. Giving such deference, we review Loughner's involuntary medication order to ensure the decision is not arbitrary. *See Morgan*, 193 F.3d at 263 ("[S]uch a determination is subject to judicial review for arbitrariness.").

### a.  Dangerousness Finding

Loughner maintains that FMC-Springfield never determined that medication was necessary to mitigate any danger that he posed to himself. In the Justification section of the Involuntary Medication Report that followed the *Harper III* hearing on September 15, Dr. Tomelleri cited Loughner's deterioration after the discontinuation of antipsychotics authorized by *Harper I*. Loughner "expressed feelings of depression and hopelessness, complained of a radio talking to him inserting thoughts into his mind, . . . engaged in yelling, crying, [and] rocking back and forth for prolonged periods of

time, made statements such as that he wanted to die, [and] requested to be given an injection to be killed." His sleep schedule became erratic, including a 50-hour period without sleep. His food intake was poor and he lost weight, and he would pace or spin in circles for hours without interruption. Since involuntary medication resumed, Loughner's agitation has decreased, his sleep has improved, and his communication with staff is progressing, but he is still restless and paces and cries frequently. Dr. Tomelleri concluded that "[p]sychotropic medication is the treatment of choice for conditions such as Mr. Loughner is experiencing," and rejected the alternatives. Psychotherapy, he wrote, would "not address the fundamental problem"; minor tranquilizers are useful to reduce anxiety and agitation and were being used for that purpose; and seclusion and restraints are "merely protective temporary measures with no direct effect on the core manifestations of the mental illness." Rejecting the argument that Loughner is no longer a danger to himself, Dr. Tomelleri stated that "[d]iscontinuation of current medications is virtually certain to result in an exacerbation of Mr. Loughner's illness as it did when medication was discontinued in July."[14]

[16] Loughner attempts to recharacterize his current danger to himself as being caused by his depression, which he attributes to the effects of the antipsychotic drugs because they are making him more lucid. Loughner thus alleges that the antipsychotics are not in his medical interest, but offers no medical opinion or other evidence to counter Dr. Tomelleri's determination. By contrast, Dr. Ballenger testified before the district court that Loughner's depression, borne of his "remorse of what happened," is "logical" and his "self-realization [was] an indication that the medication is helping" and "a very strong indication that his psychosis is better." We must leave such medical judgments to medical staff and pro-

---

[14]Dr. Tomelleri noted that, during the hearing, Loughner complained of "drowsiness" and said that his treating psychiatrist would modify his medications to address this side effect.

fessionals. *See Harper*, 494 U.S. at 230 n.12. Based on the substantial evidence in the record, we conclude that FMC-Springfield did not act arbitrarily in finding Loughner to be a danger to himself and that antipsychotic medication was in his best interest.

b.   Medication Regimen

Loughner next contends that the *Harper III* hearing violated the Due Process Clause because no specific, future course of treatment was identified and no limitations were placed upon the types or dosages of drugs that could be administered to him. He further faults FMC-Springfield staff for modifying his medication without first seeking " 'due process' authorization," and the hearing psychiatrist for relying on the current medication regimen rather than a proposed future plan.

Loughner's complaints may be contrary to his own medical interests. Loughner relies on three cases for the proposition that the government must specify his drug regimen in advance: *Hernandez-Vasquez*, 513 F.3d 908; *Evans*, 404 F.3d 227; and *United States v. Williams*, 356 F.3d 1045 (9th Cir. 2004). All involved persons who were ordered involuntarily medicated, either to render them competent to stand trial, *see Hernandez-Vasquez*, 513 F.3d at 912; *Evans*, 404 F.3d at 236, or as a condition of supervised release, *see Williams*, 356 F.3d at 1047. In each of these cases, the defendant or probationer had not been found to be a danger to himself or others. *See Hernandez-Vasquez*, 513 F.3d at 915; *Evans*, 404 F.3d at 235 n.3; *Williams*, 356 F.3d at 1057. The difference between *Harper* and *Sell* is critical here. When an inmate is involuntarily medicated because he is a danger to himself or others, he is being treated for reasons that are in his and the institution's best interests; the concern is primarily penological and medical, and only secondarily legal. But when the government seeks to medicate an inmate involuntarily to render him competent to stand trial, the inmate is being treated because of the

*government's* trial interests, not the prison's interests or the inmate's medical interests; the concern is primarily a legal one and only secondarily penological or medical. Hence, the Supreme Court has emphasized that resorting to a *Sell* hearing is appropriate only if there is no other legitimate reason for treating the inmate. *See Sell*, 539 U.S. at 181-82.

Loughner's treating psychiatrist is addressing Loughner's serious and immediate medical needs and, accordingly, must be able to titrate his existing dosages to meet his needs, and to change medications as necessary, as other treatments become medically indicated. No one who is being treated for a serious medical condition would benefit from a court order that restricted the drugs and the dosages permissible; mental illness cannot always be treated with such specificity.[15] We are not the dispensary and should let the doctors conduct their business.

The Washington policy approved in *Harper* required that the treatment plan be proposed by the treating psychiatrist and then approved by a reviewing psychiatrist. The purpose of this scheme, however, was not to limit the prison personnel's future course of treatment; it was to ensure that treatment "will be ordered only if it is in the prisoner's medical interests." *Harper*, 494 U.S. at 222. *Harper* did not envision a process in which medical professionals were limited to a

---

[15]We have recognized that such specificity is appropriate when an inmate is not a danger to himself or to others and is being medicated pursuant to *Sell*. *See Hernandez-Vasquez*, 513 F.3d at 916-17; *Rivera-Guerrero*, 426 F.3d at 1140, 1142. Even as we have expressed concern "not to grant physicians unlimited discretion in their efforts to restore a defendant to competency for trial," we have also stated that we will not "micromanage the decisions of medical professionals" and must "give physicians a reasonable degree of flexibility." *Hernandez-Vasquez*, 513 F.3d at 916-17. Noting "that instances in which an order for involuntary medication would be appropriate under *Sell* 'may be rare,' " we advised that it may be better "if the facts warrant, to find another legal basis for involuntary medication." *Id.* at 916 (quoting *Sell*, 539 U.S. at 180).

treatment plan set out in the original hearing. Rather, the Court recognized that treatment of a mental illness is a dynamic process. *See id.* at 232-33 ("Under the Policy, the hearing committee reviews on a regular basis the staff's choice of both the type and dosage of drug to be administered, and can order appropriate changes."). Loughner's suggestion that FMC-Springfield abused its authority by increasing the dosages and changing the types of prescribed medication ignores the realities of psychiatric medicine and overlooks the fact that BOP's doctors have an ethical duty to do what is in the best interest of the patient. *See id.* at 222 n.8 ("[W]e will not assume that physicians will prescribe these drugs for reasons unrelated to the medical needs of the patients; indeed, the ethics of the medical profession are to the contrary.").

**[17]** Finally, even if specificity of the treatment were required, the Involuntary Medication Report from the *Harper III* hearing lists Loughner's then-current medication regimen as 3 mg of risperidone, twice a day; 300 mg of buproprion XL, daily; 1 mg of benztropine, twice a day; 1 mg of clonazepam, twice a day, and 2 mg at bedtime. The report also states: "There is a documented treatment plan on patient's chart," and the box is checked indicating that Dr. Tomelleri considered and/or reviewed a treatment proposal and justification. Additionally, Dr. Pietz's August 22, 2011, progress report describes Loughner's psychiatric treatment as of that day, and we note that it is substantially the same as the treatment plan on September 15 3mg of risperidone, twice a day; 300 mg of buproprion XL, daily; 1 mg benztropine, twice a day; 1 mg lorazepam (anti-anxiety), three times a day, at bedtime, and as needed. Both his treating psychiatrist, Dr. Sarrazin, and the hearing officer, Dr. Tomelleri, have opined that Loughner requires medication. The district court heard additional testimony from Dr. Ballenger that Loughner's medication regimen was a standard approach to his schizophrenia and other medical conditions. Loughner has offered no evidence to the contrary, and we hold that there was no due process violation relating to the medication regimen.

### c.  Independent Decision Makers

Loughner argues that FMC-Springfield doctors were charged with competing responsibilities and that the decision makers were not independent. Independence of the decision maker is required by 28 C.F.R. § 549.46(a)(4), however, and the hearing in this case was conducted by Dr. Tomelleri, a psychiatrist who is not currently involved in the diagnosis or treatment of Loughner. The decision to medicate Loughner was upheld by the Associate Warden, who agreed with Dr. Tomelleri's findings, conclusions, and diagnosis. The bare fact that the involuntary medication decision was made at FMC-Springfield, by BOP-employed doctors, is insufficient to demonstrate a conflict without proof of actual bias. *See Harper*, 494 U.S. at 233-34. BOP is charged with caring for those who have been committed to a detention facility; it is not a prosecuting arm of the government and has no particular interest in the continued incarceration of those inmates.

The district court found "no evidence that the FMC[-Springfield] staff is in any way an ally of the Government prosecution team," Order on Def's Mot. to Enjoin Medication 5, and elaborated this point during the hearing:

> I just don't see any evidence whatsoever that the findings—the determination made by FMC[-Springfield] to take this action was colored in any way by considerations of how it's going to affect the pending charges. . . . [The] professional staff, including the professional psychologists and psychiatrists, are calling things as they see them and they're acting on the basis of observation and judgment and experience and training.

Hr'g on Mot. to Enjoin Tr. 50, June 29, 2011.

[18] We are also not persuaded that FMC-Springfield is in league with the prosecution team. It was, after all, FMC-

Springfield doctors who found Loughner incompetent to stand trial in the first place, a conclusion instinctively contrary to a prosecutor's interests. Moreover, we can take notice of the fact that the same doctors involved in Loughner's treatment have had to make these judgments in other cases, and the judgments do not always favor the prosecution. For example, in *Grape*, Dr. Pietz and Dr. Sarrazin opined that Grape was not competent to stand trial. 549 F.3d at 594-95. At a *Harper* hearing, Dr. Tomelleri found that, although Grape was a potential danger to others, he could be managed without resort to involuntary medication. *See id.* at 595. That finding forced the prosecution to ask for a *Sell* hearing, which has a much more demanding burden of proof, to medicate Grape in order to restore him to trial competency. *Id.* at 594-95. We can find no evidence that FMC-Springfield staff was biased or lacked independence.

The dissent argues that a conflict of interest may have existed because whereas the currently operative commitment order charges the medical staff with restoring Loughner to competency, the initial order charged FMC-Springfield only with determining whether restoration was possible. Dissenting Op. at 2451-52. The dissent cites language from Loughner's Notice of Medication Hearing and Advisement of Rights form as evidence that there may have been a "confusion of roles . . . with respect to FMC-Springfield's involuntary medication decision in this case." *Id.* at 2452. This form was filled out prior to the first involuntary medication decision by Loughner's treating psychologist, Dr. Pietz, who participated in the *Harper* hearings, and stated that Loughner "was referred to this facility to restore competency." Therefore, the argument proceeds, in making the initial decision to medicate involuntarily Loughner on dangerousness grounds, the medical staff may have been clouded by their interest in actually restoring him to competency.

Dr. Pietz, however, was not a key decision maker in the involuntary medication determination. 28 C.F.R.

§ 549.46(a)(6) requires the treating psychiatrist to attend the hearing and present data and background information demonstrating the patient's need for antipsychotic medication; § 549.46(a)(7) vests the presiding psychiatrist, who must not be currently involved in the detainee's treatment or diagnosis, with the authority to determine whether treatment with antipsychotic medication is necessary because of an inmate's dangerousness; § 549.46(a)(9) vests the institution's mental health division administrator with authority to resolve any appeal from the presiding psychiatrist's decision. There is no evidence that these decision makers shared Dr. Pietz's possibly mistaken understanding of the reasons for Loughner's commitment and their concomitant statutory obligations. Therefore, the district court did not clearly err in finding that FMC-Springfield did not operate under a conflict of interest.

### d. Staff Representative

Loughner argues that his appointed staff representative, John Getchell, did not adequately represent his interests at the *Harper III* hearing. He claims that in all three of the hearings, Getchell "failed to seek out or present any witnesses, cross-examine or challenge the prison's witnesses, or advocate in any other meaningful way against forced medication." Instead, Loughner contends, Getchell's sole efforts were to relay to the administrative hearing officer Loughner's witness request and continued objection to involuntary medication. Loughner further contends that the inadequacy of his staff representative deprived him of his substantive and procedural due process, and that he should have been afforded "[a] proper adversarial hearing, before a judge," and with representation of counsel. The government does not dispute Loughner's factual assertions, but argues that Getchell's representation satisfied due process.

Due process does not require that a pretrial detainee be represented by counsel. The Supreme Court has held that providing a lay adviser who understands the psychiatric issues

involved provides sufficient procedural protection. The Court has not defined further the required qualifications of the personal representative, except to hold that it need not be an attorney. *See Harper*, 494 U.S. at 236. Following the procedures outlined in *Harper*, 28 C.F.R. § 549.46 requires that the facility provide the inmate with a staff representative for the hearing. If the inmate does not request a staff representative, or requests one with "insufficient experience or education," FMC-Springfield "must appoint a *qualified* staff representative." 28 C.F.R. § 549.46(a)(3) (emphasis added).

Although the Supreme Court has only held that it is sufficient that the representative "understand[ ] the psychiatric issues involved," *Harper*, 494 U.S. at 236, we have some concerns with the adequacy of Loughner's representation. Loughner's representative, Getchell, is an LCSW. We do not doubt the ability of an LCSW to understand psychological issues in general, particularly those related to counseling and psychotherapy. What is less clear is whether an LCSW has the background necessary to challenge either the diagnosis or the medical regimen prescribed by a psychiatrist.

Our concerns may stem from some confusion over the nature of *Harper* hearings. Although the Court characterized Washington's policy in *Harper* as "an adversary hearing," 494 U.S. at 235, BOP's regulations create something of a hybrid between an adversarial hearing and an inquisitorial hearing. The expectations of advocates participating in those respective hearings are quite different. The adversarial mode is party driven, as each side has the opportunity to present its best case, and the judge or hearing officer makes a decision based on the evidence the parties have mustered. Advocates take an active role, whereas the judge remains a passive participant. By contrast, in the inquisitorial model more familiar to continental systems, the judge takes a far more active role in directing the case and developing the evidence, whereas the advocate takes a passive role. *See McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2 (1991) ("What makes a system adversarial

rather than inquisitorial is not the presence of counsel . . . but rather, the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties."); *see also* Stephan Landsman, *A Brief Survey of the Development of the Adversary System*, 44 Ohio St. L.J. 713, 714-15, 724 (1983); Jeffrey S. Wolfe & Lisa B. Proszek, *Interaction Dynamics in Federal Administrative Decision Making: The Role of the Inquisitorial Judge and the Adversarial Lawyer*, 33 Tulsa L.J. 293, 313-15 (1997). Although the adversarial model is more familiar, we have examples of inquisitorial proceedings, particularly in agencies charged with administering benefits programs, such as social security or veterans' benefits. *See Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial."); *Nat'l Ass'n of Radiation Survivors*, 473 U.S. at 309-11 (explaining that the Veterans' Administration benefits system is not an "adversary mode").

The *Harper* hearing bears some characteristics of both systems. At first glance, the *Harper* hearing is decidedly adversarial because the purpose is to determine if the inmate can be medicated against his will. Unlike agency hearings to determine an applicant's eligibility for federal largesse, the *Harper* hearing pits the inmate against his prison doctor in a clash over his best interests. Beyond this obvious difference, however, it is less clear that the hearing has been structured in either a plainly adversarial or plainly inquisitorial fashion. The hearing officer is not a judge but a doctor charged with confirming or rejecting the medical judgment of a colleague. That makes the hearing officer not just a neutral decision maker, but a decision maker who has been selected precisely because of his own expertise in the field. As in an inquisitorial system, the hearing officer conducts the proceeding and directs the development of the evidence. *See* 28 C.F.R. § 549.46(a)(4), (7).

In a *Harper* hearing, the government is not represented by counsel, but by the inmate's own treating psychiatrist or psy-

chologist who is there to testify as to why, in her judgment, the inmate's own interests, as well as BOP's institutional interests, require that the inmate be involuntarily medicated. The treating psychiatrist has no interest in the outcome of the hearing other than to present and defend her own diagnosis and recommendation. Importantly, she is not directing the case in the sense that we would expect from the government's advocate in a purely adversarial proceeding. For his part, the inmate may present evidence, request his own witnesses, and ask that any witnesses be questioned. BOP's regulations provide, somewhat ambiguously, that witnesses may be questioned either "by the staff representative or by the person conducting the hearing." *Id.* § 549.46(a)(3). The staff representative also "assist[s] the inmate in preparing and submitting the appeal." *Id.* § 549.46(a)(8). The acts required of the staff representative do not necessarily speak in terms of advocacy, but require that the staff representative facilitate the inmate's presentation at the hearing and any appeal.

The role of the inmate's staff representative changes—and perhaps dramatically—as we characterize the *Harper* hearing as adversarial or inquisitorial. If it is adversarial, then we would expect the staff representative to assist the inmate to present any evidence or request witnesses who would challenge his treating psychiatrist's assessment that he is a danger to himself or others and the recommendation that the inmate be medicated against his will. Indeed, in some circumstances, we might assume that the staff representative should vigorously represent the inmate's desire not to be medicated. On the other hand, if the *Harper* hearing is largely inquisitorial in nature, then the hearing officer has the primary duty to develop the evidence to his own satisfaction, and the staff representative is there to facilitate the presenting of evidence or witnesses for the inmate.

On balance, although the question is a curious one, the *Harper* hearing is about countermanding the desires of the inmate in an area in which he "possesses a significant liberty

interest in avoiding the unwanted administration of antipsychotic drugs." *Harper*, 494 U.S. at 221. Within our traditions, and in the absence of clearer direction in the regulations, we consider the *Harper* hearing to be adversarial.

Based on that premise, we question whether any representative appointed by BOP who is not qualified to make medical diagnoses or prescribe medication—or, at the least, qualified by training to know what medications are typically called for to treat serious mental illnesses—can meet the inmate's treating psychiatrist on a level playing field. We thus question whether Getchell, as Loughner's representative, was placed in a situation where his training did not qualify him to challenge Loughner's treating psychiatrist. In other words, in the American adversarial tradition, we wonder whether, in a contest to be decided by a hearing officer who is a psychiatrist, the hearing really pits adversaries and advocates prepared to challenge each other fairly. We do not mean to suggest that a *Harper* hearing requires that counsel be present, lest "[t]he role of the hearing [officer] itself . . . may become more akin to that of a judge at a trial, and less attuned to the [medical] needs of the individual." *Gagnon v. Scarpelli*, 411 U.S. 778, 787-88 (1973). But it may suggest a more demanding role for the staff representative.

Here, Getchell's failure to present any affirmative evidence or question any of the evidence in support of involuntary medication may indicate that his representation was unqualified or procedurally defective.[16] *See Morgan*, 193 F.3d at 265-66 (noting that the staff representative's lack of "meaningful participation" during the administrative hearing sup-

---

[16]The government points out that one of Loughner's attorneys, Anne Chapman, acted as a witness by submitting a written statement raising factual and legal arguments against involuntary medication. A written statement, however, may not necessarily cure a procedural defect because it does not afford the opportunity to respond to evidence or arguments put forward at the hearing.

ported the inference that the staff representative lacked "sufficient education and experience" as required by the regulations); *United States v. Humphreys*, 148 F. Supp. 2d 949, 953 (D.S.D. 2001) (finding that the staff representative did not meet the requirements of due process because she presented no evidence; testified against the defendant, stating that she believed he had a mental illness; and may have filed a disciplinary report against the defendant when he first arrived at FMC-Rochester). Or, it may simply indicate that Getchell had nothing to say because the evidence was overwhelming that Loughner required medication and that his prescriptions were standard protocol. We cannot determine the answers to these questions from this record. If we were deciding this matter based on the *Harper III* hearing alone, we might well send the case back for further proceedings or a new *Harper* hearing.

**[19]** The record in this case, however, is far more complete because the district court held an extensive hearing following *Harper III*. *See* Order Den. Stay 2, Oct. 3, 2011 (referring to "the lengthy and, at times, tedious hearing"). Thus, we think that any error that may have resulted from the staff representative's lack of advocacy in the *Harper III* hearing was harmless. Three *Harper* hearings all reached the same conclusion: Loughner is a danger and needs to be medicated.

The *Harper III* hearing was followed by a district court hearing where each party had the opportunity to call witnesses. The government called Dr. Pietz, Loughner's treating psychologist, and Dr. Ballenger, a clinical psychiatrist and independent expert. At the hearing before the district court in late September 2011, Dr. Pietz testified to her daily contact with Loughner, beginning in March 2011. She testified concerning Loughner's behavior, her conversations with him, and his contacts with other FMC-Springfield staff. Dr. Ballenger provided a written statement and testified before the district court. Dr. Ballenger has more than forty years experience, having served as a professor at the University of Virginia

Medical Center and Chairman of the Department of Psychiatry and Behavioral Sciences at the Medical University of South Carolina. He has authored or co-authored almost 400 peer-reviewed articles and 16 books, most of which deal with psychopharmacology. Dr. Ballenger did not examine Loughner or perform a comprehensive review of his treatment records, but he had reviewed Loughner's progress notes and had spoken to Loughner's treating psychiatrist, Dr. Sarrazin. He provided general background on first- and second-generation antipsychotic medications and their effectiveness and side-effects. Dr. Ballenger testified regarding the drugs and dosages prescribed for Loughner, and he affirmed that the regimen was "the logical routine" and the dosages were "highly appropriate." He confirmed that the combination of drugs Loughner's psychiatrist had prescribed presented "no problems of using them together."

Although the district court attempted to keep both sides "focus[ed] on the issue of the day"—i.e., the extension of commitment under 18 U.S.C. § 4241(d)(2)—the district court also addressed the adequacy of the *Harper III* hearing. Thus, at the hearing, Loughner had the opportunity to challenge the assessments of his doctors, and to present evidence that the dangerousness finding at his *Harper* hearings was arbitrary. Loughner's counsel cross-examined both Dr. Pietz and Dr. Ballenger. His counsel called no witnesses, but produced graphs and charts compiled from Loughner's own FMC-Springfield medical records. Ultimately, the government's presentation was nearly unchallenged by Loughner's counsel. Indeed, over the course of months, and numerous hearings before the district court, Loughner has never presented any witnesses or other evidence that calls into question his diagnosis or treatment. The evidence before the district court thus fully supported the judgment reached at the *Harper* hearings.

Additionally, in making the finding that there was "a substantial probability that within a reasonable period of time . . . Mr. Loughner can be restored to competency," *see* 18 U.S.C.

§ 4241(d)(2), the district court relied on Loughner's "ongoing treatment" at FMC-Springfield. Because his "ongoing treatment" necessarily encompassed the involuntary medication of Loughner, a current, valid involuntary medication order must exist. Thus, Loughner effectively had two chances to attack the existing *Harper* order during the hearing regarding the extension of his commitment: by either attacking the *Harper* order directly or as a challenge to the § 4241 determination. But Loughner called no witnesses, introduced no new evidence, and did not allege that the doctors chose a course that was medically inappropriate. Any deficiency in Getchell's representation in Loughner's case was cured in the district court's subsequent hearing.

\* \* \* \* \*

**[20]** We conclude that Loughner was provided with the substance and procedure demanded by the Due Process Clause before the government involuntarily medicated him. It is clear that Loughner has a severe mental illness, that he represents a danger to himself or others, and that the prescribed medication is appropriate and in his medical interest. There was no arbitrariness in the district court's order denying the motion to enjoin Loughner's emergency treatment. He may be involuntarily medicated.

## IV. COMMITMENT TO RESTORE COMPETENCY

We next turn to Loughner's appeal of the district court's extension of his commitment. This is a separate inquiry and, although the issues are related, we must keep the issues distinct. The dissent, however, argues that the involuntary medication and commitment decisions are one and the same. *See* Dissenting Op. at 2446-47. Because "the court . . . must decide whether Loughner is to be medically treated so as to be restored to competency" and because that decision "depends on the availability of involuntary medication," the dissent argues that the district court may not rely on a previous

involuntary medication order, but instead must make an independent decision as to whether the medication is justified and unlikely to infringe on Loughner's fair trial rights. *Id.* at 2440-42. But these determinations must be kept separate. 18 U.S.C. § 4241(d)(2) requires a court to decide whether "there is a substantial probability that . . . [the detainee] will attain the capacity to permit the proceedings to go forward." Although the court will necessarily have to consider the pre-existing treatment that will lead to such attainment, the basis for that treatment, when it is involuntary medication, is 28 C.F.R. § 549.46. This is a completely separate authorization, and one that the Supreme Court has indicated may be made in an administrative hearing. We therefore address whether, given the currently operative involuntary medication order, the district court properly extended Loughner's commitment pursuant to § 4241(d)(2).

**[21]** Under 18 U.S.C. § 4241(d), if a court finds that a defendant's mental disease renders him "mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," the court shall commit the defendant for up to four months to determine if there is a "substantial probability" that he will be restored to competency. 18 U.S.C. § 4241(d)(1). After such time, the court shall commit the defendant "for an additional reasonable period of time until" he is fit to proceed to trial, "if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward." *Id.* § 4241(d)(2); *see also Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

In challenging the extension of his commitment, Loughner raises three claims. First, he contends that the district court's order extending his commitment is flawed because the court failed to demand a particularized course of treatment from FMC-Springfield. Second, he argues that the district court did not consider whether the antipsychotic medications would

render his trial unfair. Third, he maintains that the district court clearly erred in finding that there is a "substantial probability" that Loughner will regain competency. We will consider each in turn.[17]

## A. *Particularized Course of Treatment*

Loughner argues that the district court failed to consider the medical appropriateness of his treatment regimen and, without considering that regimen, could not assess the likelihood of Loughner being restored to competency.

We think Loughner has failed to distinguish between the reasons for which he may be medicated pursuant to *Harper*—reasons that predominantly have to do with the prison's and his own medical interests—and the reasons for which he may be medicated pursuant to *Sell*—which involve the government's interests. Loughner is being medicated for his serious mental illness irrespective of whether he can concomitantly be restored to competency in order to stand trial. The purpose of the district court's hearing was to determine whether, in light of his existing treatment, there is a "substantial probability that within [the] additional period of time he will attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(2). If his current regimen is sufficient to determine that there is a substantial probability that he can be rendered competent, then he can be "hospitalize[d] . . . in a suitable facility." *Id.* § 4241(d). If, however, the treatment for his dangerousness will not concomitantly render him trial-competent,

---

[17]We review the district court's legal conclusions de novo and its factual findings for clear error. *See Ruiz-Gaxiola*, 623 F.3d at 693. We review a district court's competency determination for clear error. *Friedman*, 366 F.3d at 980; *United States v. Gastelum-Almeida*, 298 F.3d 1167, 1171 (9th Cir. 2002). "A trial court's factual finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Ruiz-Gaxiola*, 623 F.3d at 693 (internal quotation marks omitted).

then additional medication could be forced upon him only if it is in the government's (rather than his own) interests, and in such case the government would have to proceed under *Sell*. As the Court explained in *Sell*, "[a] court need not consider whether to allow forced medication for [trial competency purposes], if forced medication is warranted for a *different* purpose . . . . If a court authorizes medication on these alternative grounds, the need to consider authorization on trial competence grounds will likely disappear." 539 U.S. at 181, 183.

We agree with Loughner that the existing involuntary medication decision is important to the overall outcome of the § 4241(d)(2) proceeding because it "likely affect[s] both the scope and term of a § 4241(d)(2) order." *United States v. Magassouba*, 544 F.3d 387, 418 n.27 (2d Cir. 2008). Section 4241(d), however, is a commitment statute, not an involuntary medication statute, and a § 4241(d)(2) extension of commitment for purposes of competency restoration does not alter the legitimacy of the decision to medicate involuntarily Loughner under *Harper*. The court must therefore consider only whether his ongoing treatment is likely to restore competency, not whether it is medically appropriate. The medical appropriateness of Loughner's treatment was addressed in his *Harper* hearing, and we have approved that treatment. *See supra* Part III.

In any event, the district court heard "what medications the defendant is receiving, what *dosages* of those medications he is receiving, and *when* during the day he is receiving those dosages." Order Den. Stay 4-5. Although the district court assumed that the "present medication regimen will continue with only minor modifications," *id*. at 5, the district court heard testimony that Loughner's medication regimen has changed in the months that he has been committed to FMC-Springfield, and his treating psychologist, Dr. Pietz, testified that his medication might continue to change. Dr. Ballenger testified that the medication currently administered to Lough-

ner was "highly appropriate" but that if Loughner does not fully respond to the medication, it would be "a very appropriate strategy" to increase the dosages, even doubling some. But the administration of antipsychotic drugs is a fluid process and must be adjusted depending on how the patient reacts and why, if any, side effects are experienced. *See* APA Br. at 26 ("[T]he choice whether and how to medicate an inmate is not a one-time decision; it involves a process of monitoring and, for many patients, adjustments in medication and dosage."); *see also Indiana v. Edwards*, 554 U.S. 164, 176 (2008) ("Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways."). Requiring FMC-Springfield to submit with particularity the exact course of treatment over several months is impractical and unnecessary, and would ignore the concerns expressed in *Harper* that *medical* decisions should not be made by judges. *See Harper*, 494 U.S. at 232 ("'The mode and procedure of medical diagnostic procedures is not the business of judges . . . .'" (quoting *Parham*, 442 U.S. at 607)); *id.* at 231 n.12 (stating that deference should be given to medical professionals in making medication decisions because courts do not have the necessary knowledge or expertise).[18]

**[22]** The district court found that Loughner was being lawfully medicated pursuant to *Harper* and that there was a substantial probability that his existing treatment will restore him to competency to stand trial. In the process, the court considered Loughner's existing regimen but did not undertake to micromanage his treatment or otherwise limit his course of treatment. *See Harper*, 494 U.S. at 231 n.12; *Hernandez-*

---

[18]The district court noted that there was no "evidence that the FMC[-Springfield] staff is medicating the defendant under *Harper* just to avoid a more stringent *Sell* hearing . . . . The FMC[-Springfield] staff has no *obligation* to restore the defendant to competency, and indeed, the staff is free to report to the Court that the defendant cannot be restored or has not been restored within the time allowed." Order on *Sell* Hr'g 6 n.3, Oct. 27, 2011.

*Vasquez*, 513 F.3d at 916-17. The Due Process Clause does not demand more.

## B. *Side Effects and Fair Trial Rights*

Loughner argues that when forced medication is the means employed by BOP to seek restoration of competency, the district court must engage in a predictive analysis of whether side effects are substantially unlikely to render a trial unfair before the defendant can be committed under § 4241(d)(2). Specifically, Loughner argues that the district court must predict whether the antipsychotic medication is substantially unlikely to alter his demeanor in a manner that will prejudice his reactions and presentation in the courtroom, and render him unable or unwilling to assist counsel. Loughner's concerns are well-taken, but premature. As the district court recognized, Loughner will have a full and fair opportunity to raise his concerns before he goes to trial. See Order on *Sell* Hr'g 8. To demand that the district court answer such questions at this juncture blurs the distinction between a defendant who is being medicated under *Harper* and one the government seeks to medicate under *Sell*.

Before a defendant can be committed for evaluation of his competence, the district court must find that the defendant "is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). The premise for granting the government's motion for a competency examination of Loughner at FMC-Springfield in March 2011 was "reasonable cause to believe" that he was not competent to understand trial procedures or to assist in his defense. *Id.* § 4241(a). That belief was confirmed shortly after Loughner was committed. Before granting an extension of commitment for the purpose of restoration, the district court must find that there is a substantial probability that the pretrial detainee "will attain the capacity to permit the proceedings to go forward." *Id.* § 4241(d)(2). Once these findings are made, the court must then commit the defendant for

a reasonable period of time until trial may proceed. *Id.* The statute itself therefore contemplates that the "capacity" that the district court is required to predict is the ability to understand the nature and consequences of the proceedings and to assist in his defense—in other words, competency. *See United States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008) ("The substantive standard for determining competence to stand trial is whether the defendant had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and a rational as well as factual understanding of the proceedings against him." (internal quotation marks omitted)); *see also Edwards*, 554 U.S. at 174 (explaining that the Supreme Court's "mental competency" cases have defined "competency" in terms of "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense" (emphasis omitted) (quoting *Drope v. Missouri*, 420 U.S. 162, 171 (1975)); Order Extending Restoration Commitment 2 n.1 (finding that competency and capacity are equivalent).

*Sell* requires, among other things, that the government demonstrate not only that involuntary medication is "likely to render the defendant competent to stand trial," but that "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." *Sell*, 539 U.S. at 181; *see also id.* at 185 ("Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence . . . ."). That predictive judgment is required where the government seeks to medicate the defendant for no reason other than to render him competent. As we have pointed out, Loughner is being medicated involuntarily because he is a danger to himself or others, irrespective of whether the medications may cause side effects that interfere with his ability to assist counsel in his defense. A

district court's judgement on side effects is both premature and irrelevant at this stage. *See* Order Den. Stay 3 ("It was obviously premature at this stage of the competency restoration process for the Court to determine whether there are side effects of the defendant's medication that will prevent the Court from making a finding of competency in the future.").

**[23]** Because Loughner remains under medical treatment for his mental illness, the district court properly focused on whether his treatment might also restore him to competency. The district court acknowledged that Loughner's concerns "will be fully addressed if there is a future competency hearing." Order on *Sell* Hr'g 8. We agree that such concerns are important and that Loughner should have an opportunity to raise these issues. We also agree that the district court need not address Loughner's concerns before deciding to extend his commitment to determine whether he can be restored to competency.

C. *Substantial Probability of Restoration of Competency*

Loughner contends that the district court applied the wrong legal standard in granting the extension of commitment, arguing that the "substantial probability" of restoration must be proven by clear and convincing evidence. First, we agree with the district court that a second layer of proof is not required and that the statute itself provides the requisite burden of proof—the government must prove there is a "substantial probability" that Loughner will regain competency. *See* 18 U.S.C. § 4241(d)(2)(A).

**[24]** Next, in defining that standard, the district court noted that "a 'substantial' probability is any probability worth taking seriously." Order Extending Restoration Commitment 3. To demonstrate this proposition, the court used an analogy: "For example, a 40 percent chance of rain is enough of a reason to leave the house with a raincoat, or cancel plans to spend a day outside; it wouldn't be unreasonable to label that

chance 'a substantial *probability*,' even if rain is not substantially *probable*." *Id.* The district court then looked to Ninth Circuit precedent, finding that " 'courts have generally construed § 4241(d)(2) to allow extensions for a reasonable period of time only when the individual is *likely* to attain competency within a reasonable time.' " *Id.* at 4 (emphasis added) (quoting *Rivera-Guerrero*, 426 F.3d at 1143) (some internal quotation marks omitted). The district court's determination that "substantial probability" means "likely" (and not necessarily "more likely than not") was based on both a fair reading of the statute and the guidance of our precedent and, therefore, we agree.

**[25]** Loughner further challenges the district court's finding that there was a "substantial probability" that Loughner can be restored to competency as clear error. He raises three objections to the district court's § 4241(d)(2) finding: (1) that his past improvement does not support an inference that his condition will continue to improve to the point of competency, (2) that expert opinion regarding the amount of time required for restoration was unsupported by any specific data and impermissibly relied on generalities, and (3) that the district court improperly relied on Dr. Ballenger's testimony because it equated functional competency with trial competency. After reviewing the evidence, we are not "left with the definite and firm conviction that a mistake has been committed." *Ruiz-Gaxiola*, 623 F.3d at 693 (citations omitted) (internal quotation marks omitted).

## 1.  Past Improvement

Loughner argues that because a response to medication will eventually plateau, some additional indication beyond past improvement is required to establish a probability that his condition will continue to improve to the point of competency. In concluding that Loughner was likely to continue improving, however, the district court did not rely solely on Loughner's past improvement. The court based its finding on

Loughner's positive response to the antipsychotic drugs, including the lack of significant side effects; Dr. Pietz's testimony regarding Loughner's progress and potential for further progress; the experience of Dr. Ballenger, corroborating the "optimistic viewpoint and prognosis" of Dr. Pietz; and his own observations of Loughner's improvement. Regardless, past experience is often the best predication of future performance, and the district court did not clearly err in basing its determination of the likelihood of competency restoration on readily available evidence of Loughner's reaction to antipsychotic medication already administered, and the views of the medical experts who testified.

## 2. Time Required for Restoration to Competency

Loughner next disputes the district court's finding that restoration would be accomplished in four months, and the basis for Dr. Pietz's opinion that Loughner could be restored to competency within eight months.

In her progress report on September 7, 2011, Dr. Pietz opined that Loughner remained incompetent to stand trial. She requested an extension of his commitment because she believed that Loughner would improve and reach competency to stand trial. Dr. Pietz could not predict how much additional time was required, but she noted that "[h]istorically, most defendants reach competency within 8 months of their commitment," and recommended that Loughner's commitment be extended for four months. At the extension hearing, Dr. Pietz clarified that "the eight months goes to when we start to medicate [him]." In coming to the eight-month figure, Dr. Pietz relied on her experience restoring defendants to competency over twenty-one years, her colleagues' experience, a book, and several articles that were presented to the district court. She did not have, however, any formal data from which she based her figure of eight months. Dr. Pietz further explained that she recommended an extension of commitment for four months because, based on her understanding of the statute and

her experience, extensions are granted in four-month increments, with the possibility of a second extension if necessary. *See* 18 U.S.C. § 4241(d). Based on the testimony that he heard from Dr. Pietz, a review of the records in this case, and his own experience, Dr. Ballenger confirmed that it is "highly likely" that Loughner will get clinically better in "two to six, eight more months."

The district court found that Dr. Pietz is credible, experienced, and qualified to make the judgments required of her during the commitment hearing. The court further credited Dr. Pietz's day-to-day personal contact with Loughner, as well as her "barometer on whether he's made progress [and] whether he'll continue to make marked progress." Status Hr'g Tr. 275. Additionally, Dr. Pietz's opinion was supported by the testimony of Dr. Ballenger, an "experienced and well-credentialed psychiatrist."

The district court did not rely exclusively on the experts. At the hearing, the district judge found that "measurable progress toward restoration has been made," *id.*, and offered his own observation of Loughner's progress:

> I watched Mr. Loughner today as I have in the other proceedings. His demeanor, while all the characterizations are correct about flat affect and all, has been distinctly different than in other proceedings. . . . The smirk, what we referred to as affect, is gone. He's appeared to pay attention to the proceedings today. In earlier proceedings, the court notes that he wasn't particularly paying attention. He was looking down, looking away, didn't seem connected at all. Today, in my lay view, he does appear to be more connected to the proceedings, appears to be paying attention to what's going on.

*Id.* at 276-77. After admitting that he is "not a physician," the district court judge concluded that "everything I observe

about [Loughner] seems to connect with the expert testimony that I've heard; that there is reason to be optimistic, that he will recover and be able to assist his lawyers in defending him against this case." *Id.* at 277.

Next, the district court determined the appropriate length of the commitment extension. The court considered Dr. Pietz's request for an additional eight months, as modified from her original request for four months, based on her prior understanding of the statute and case law. Recognizing that "[i]t's for me to determine what is a reasonable period of time," the district judge explained that he could not "at this point [predict] that it would be four months or eight months." *Id.* at 278. The court also noted that it was established that if Dr. Pietz or the physicians at FMC-Springfield determined that Loughner was restored to competency before the end of the four-month extension, the court would be notified. Thus, following another district court decision, the district court set a four-month period, with the possibility of granting another extension if necessary. *See United States v. Rodriguez-Lopez*, No. CR 08-2447, 2010 WL 4339282, at *8 (D.N.M. Sept. 22, 2010) ("Section 4241 provides insight into the measure of a reasonable 'additional period of time' by establishing that an initial reasonable period is 'not to exceed four months.' The statute appears to contemplate one four-month term followed by another four-month term." (citation omitted)).

The district court based its § 4241(d)(2) determination on the credible testimony of both Dr. Pietz and Dr. Ballenger; a reading of all the evidence in the record, including contrary evidence presented by Loughner; and the district judge's own observations. Loughner did not offer any evidence that he could not be restored to competency within four months. We find that the district court considered proper evidence before it and did not clearly err in determining that there was a substantial probability that Loughner would be restored to competency within four months.

### 3.   Trial Competency and Clinical Competency

Loughner finally argues that the district court erred in accepting Dr. Ballenger's testimony as a proxy for competency restoration. *See Riggins*, 504 U.S. at 141 (Kennedy, J., concurring) ("The avowed purpose of the [involuntary] medication is not functional competence, but competence to stand trial."). In the oral ruling on September 28, the district court acknowledged that clinical competence

> is a proxy, that is a parallel of what's going on here. Restoration in the case of someone in a clinical setting, for all intents and purposes, is the same goal that we have in this case, which is to get somebody functioning again as a human being who understands, appreciates, and assists in the context of the criminal case with the defense of his case.

Status Hr'g Tr. 276.

Although restoration in the clinical setting may not be "the same goal" as restoration for trial competency, Dr Ballenger's testimony was certainly relevant for determining the likelihood of restoration, generally, of signs of an improvement in mental disease (and thus whether Loughner's condition has improved thus far), and the likelihood of restoration given Loughner's current treatment regimen. Thus, the district court did not clearly err in relying on Dr. Ballenger's testimony to support a finding that there was a substantial probability that Loughner would attain the capacity to permit the proceedings to go forward.

\* \* \* \* \*

**[26]** The district court did not commit legal error in its commitment rulings, and its finding that there is a substantial probability that Loughner will be restored to competency in the foreseeable future is supported by the evidence and not

clearly erroneous. Loughner may be committed pursuant to the district court's order and subject to its supervision.

## V. CONCLUSION

The judgment in No. 11-10504 is AFFIRMED. Because the *Harper III* hearing supercedes the prior *Harper* hearings and the emergency medication order, appeals No. 11-10339 and No. 11-10432 are DISMISSED as moot.

WALLACE, Senior Circuit Judge, concurring in all but Part III.B.3.d. of Judge Bybee's opinion and concurring in the judgment:

I concur in the opinion and judgment and I join the excellent analysis in all sections except Part III.B.3.d. I do not join in the negative speculation that Loughner's staff representative, John Getchell, was unqualified or that Getchell's performance was procedurally defective.

Judge Bybee suggests that Getchell, a Licensed Clinical Social Worker, might not "understand[ ] the psychiatric issues involved" in medicating Loughner sufficiently to satisfy *Washington v. Harper*, 494 U.S. 210, 236 (1990) and qualify as a staff representative under 28 C.F.R. § 549.46(a)(3). *See* Opinion at 2406. This suggestion is made with nothing in the record to support it.

But a more basic question is why is this suggestion in the opinion at all? The sufficiency of Getchell's understanding was never raised by Loughner. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived").

Furthermore, I do not join in viewing the dearth of record on Getchell's qualifications to support the possibility of send-

ing this case back to the district court. Instead, I would view it as a reason to affirm because it means that Loughner has not met his burden to show the arbitrariness of the Bureau of Prison's decision. *See* Part III.B.3 (describing standard of review).

Judge Bybee also suggests that Getchell's representation might have been procedurally defective because he did not present affirmative evidence or question any of the evidence in support of involuntary medication. *See* Opinion at 2409-10. This suggestion that Getchell's performance was flawed for not acting more like an advocate follows from Judge Bybee's labeling a *Harper* hearing as "adversarial." *See* Opinion at 2408-09. I disagree with his analysis on this issue because, whatever label is given to *Harper* hearings, *Harper* itself requires no more than "the provision of an independent lay adviser who understands the psychiatric issues involved." 494 U.S. at 236. There is no record evidence this standard was not met. There is nothing in *Harper* giving the adviser a duty to act as an advocate in the traditional adversarial sense. Nor does 28 C.F.R. § 549.46 require the staff representative to seek affirmatively to develop evidence in the inmate's favor. *See* 28 C.F.R. § 549.46(a)(3) (inmate may "*request* that witnesses be questioned by the staff representative") (emphasis added). The standard for this administrative hearing has been set by Congress. Supreme Court cases have not expanded this standard. Why should this court tamper with it?

The basis of the tampering is questionable. I disagree with Judge Bybee's categorization of a *Harper* hearing as "adversarial" rather than "inquisitorial" to the extent the categorization is used to support a due process requirement for a staff representative to act as an adversarial advocate. As he recognized, "[w]hat makes a system adversarial rather than inquisitorial is not the presence of counsel . . . but rather, the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties." *McNeil v. Wisconsin*, 501 U.S. 171,

181, n.2 (1991). In Loughner's *Harper* hearings, the presiding psychiatrist, Dr. Tomelleri, acted as an inquisitor. Dr. Tomelleri interviewed and observed Loughner and used the interviews as a basis for his decisions. Loughner could have requested that any other witnesses be questioned by the Dr. Tomelleri. *See* 28 C.F.R. § 549.46(a)(3).

That a *Harper* hearing involves overcoming a person's desires with respect to a significant liberty interest does not require that the proceeding be an adversarial hearing with an advocate-representative. *In Wolff v. McDonnell*, the Supreme Court did not impose a right to counsel in connection with prison disciplinary proceedings, even where good time credits are at stake, because "[t]he insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals." 418 U.S. 539, 570 (1974). In *Parham v. J.R.*, the Supreme Court did not require a hearing when a staff physician determines whether a child may be voluntarily committed to a state mental institution by his parents. 442 U.S. 584 (1979). The Court permitted the use of "informal traditional medical investigative techniques," in part, because "[w]hat is best for a child is an individual medical decision that must be left to the judgment of physicians in each case." *Id.* at 607-08. The Court was also concerned that an adversarial hearing might pose a danger "for significant intrusion into the parent-child relationship" and might "exacerbate whatever tensions already exist between the child and the parents" to the detriment of "the successful long-range treatment of the patient." *Id.* at 610. Similar concerns are present in this case: a *Harper* hearing is aimed at reaching a medical judgment, *see* Part III.B.2.c., and to require the hearing to become more adversarial might well intrude into the doctor-patient relationship to the detriment of Loughner's long-range treatment.

The basis for recasting the role of the staff representative into an attorney-like advocate appears to come from a "home-

town" preference or, as Judge Bybee puts it: "[w]ithin our traditions." Opinion at 2409. There are two problems with this approach. First, the vast majority of countries use the "inquisitorial" or "civil" trial practices to ascertain truth. We are used to our hometown process, but that does not make the vast majority of court systems wrong or inadequate.

Second, there is no argument in Judge Bybee's opinion that the inquisitorial method is unconventional. Indeed, he identifies areas of significant importance where the inquisitorial or civil method is effectively used in our country. *See* Opinion at 2407.

In any event, this case does not give us free rein to design from scratch whatever procedures we think would be best for the Bureau of Prisons to follow. Instead, we are required to give substantial deference to the penological regulations already in existence. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"). Judge Berzon's dissent never acknowledges this principle, and none of the cases she relies on actually hold that due process requires more than compliance with existing regulations. *See United States v. Morgan*, 193 F.3d 252, 253 (4th Cir. 1999) (remanding for factual findings as to whether the staff representative had the education and experience required by regulation); *United States v. Humphreys*, 148 F. Supp. 2d 949, 953 (D.S.D. 2001) (requiring a representative "that will more fully comply with the due process requirements of section 549.43"); *United States v. Weston*, 55 F. Supp. 2d 23, 26-27 (D.D.C. 1999) (remanding to Bureau of Prisons because of non-compliance with a court order and prison regulations). There is no reason to depart from the regulations and impose additional requirements on the conduct of a staff representative.

Here, the standards of *Harper* and 28 C.F.R. § 549.46 have been met. Getchell explained Loughner's rights to him and presented him the opportunity to answer any questions about the process; Getchell was present at the *Harper* hearings; Getchell encouraged Loughner to participate despite his initial reluctance; and twice Getchell appealed on Loughner's behalf. There is no evidence that Getchell was unable or unwilling to provide any assistance requested by Loughner or his attorneys at the time of the *Harper III* hearing. Not one piece of evidence is before this court that Getchell was unqualified to perform the task identified in the governing statute. No wonder Loughner did not raise that issue on appeal.

I need not get to the harmless error analysis, but I agree that any imagined error would be harmless. Thus, I join in that holding. My division from Judge Bybee is that no error was shown and any consideration of an imagined error would be inappropriate. Because *Harper* and 28 C.F.R. § 549.46 do not provide a right for the type of advocate-representative that Loughner now seeks, there was no Constitutional deficiency in Getchell's performance.

---

BERZON, Circuit Judge, dissenting:

Viewed realistically, what the majority holds is that the district court correctly abdicated to Loughner's prison physicians the responsibility to determine whether he is to be restored to trial competency through involuntary medication. The form of the majority opinion obscures that holding, as it addresses first the quite separate question of the standards and procedures applicable to the mid-commitment decision to medicate a pretrial detainee for reasons of dangerousness. But that is not where we are now in this case. Instead, we are, principally, reviewing the district court's decision as to *whether* Loughner is to be committed to a federal medical facility for

purposes of restoration of competency to stand trial, a goal that, all agree, could be accomplished only through psychotropic medication, which Loughner refuses to take voluntarily. As I cannot agree that Loughner may be so committed without a judicial determination as to the propriety of involuntary medication and because, even on the majority's approach, I see several deficiencies in the administrative proceedings conducted by the medical center's physicians — I respectfully dissent.

## I. Background

I begin by highlighting certain aspects of the relevant proceedings crucial to the resolution of this case.

### A. *The first* Harper *proceeding*

As the nation is well aware, Jared Loughner, a seriously disturbed young man, shot at Congresswoman Gabrielle Giffords and her entourage outside a Tucson supermarket on January 8, 2011, profoundly injuring her and killing Federal District Judge John Roll and five others. He was indicted for numerous criminal offenses relating to the shooting. Finding that Loughner presented a danger to the community, the district court ordered him committed to the federal government's custody for confinement at a corrections facility pending trial. Two months later, the district court granted the government's motion for a competency examination and, pursuant to 18 U.S.C. § 4247, committed Loughner to the United States Medical Center for Federal Prisoners in Springfield, Missouri (FMC-Springfield) for evaluation. There, a Bureau of Prisons staff psychologist, Dr. Christina Pietz, and an independent psychiatrist, Dr. Matthew Carroll, examined Loughner and issued forensic reports to the district court. Doctor Pietz observed in her report that Loughner "was polite, cooperative, and forthcoming" during their initial interview and that he was, "[f]or the most part . . . cooperative with correctional staff" during the examination period. Both Dr. Pietz and Dr.

Carroll diagnosed Loughner with schizophrenia and concluded that he was, at that time, incompetent to stand trial.[1] The district court agreed and ordered Loughner committed to the Attorney General's custody for a four-month period of hospitalization at FMC-Springfield, to "to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(1).

At FMC-Springfield, Loughner's physicians prescribed psychotropic medication, but Loughner refused to take it. The facility therefore decided to conduct an administrative proceeding to determine whether Loughner should be involuntarily medicated. On June 2, Dr. Pietz, now Loughner's treating psychologist, provided Loughner a Notice of Medication Hearing and Advisement of Rights form. The form explained that Loughner was diagnosed with "undifferentiated schizophrenia" and that the proposed treatment was "anti-psychotic medication." Under the heading "Reason for Treatment," the form stated: "Mr. Loughner suffers from a mental illness and refused to take the medication prescribed to him. He was referred to this facility to restore competency."

On June 14, the prison conducted an administrative involuntary medication hearing ("*Harper I*"), pursuant to the procedures outlined in the then-current federal regulation, 28 C.F.R. § 549.43, and *Washington v. Harper*, 494 U.S. 210 (1990). Doctor Carlos Tomelleri, a prison psychiatrist not involved in Loughner's diagnosis and treatment, presided over the proceedings. The hearing's other participants included Loughner, his staff representative John Getchell (a prison employee who is a licensed social worker), Dr. Robert

---

[1] Doctor Pietz noted that "medication is the only option for restoring Mr. Loughner to competency" and recommended that Loughner "should be returned to [FMC-Springfield], pursuant to Title 18, Section 4241d for restoration to competency."

Sarrazin (chief of psychiatry at FMC-Springfield and Lough-ner's treating psychiatrist), and Dr. Pietz.[2]

The hearing did not go well. Loughner barricaded himself behind his bed and refused to participate in the proceeding. There is no evidence in the record to suggest that Getchell made any statements or inquiries on Loughner's behalf at the hearing.

In his post-hearing involuntary medication report, Dr. Tomelleri concluded that the involuntary administration of psychotropic medication was justified on the ground that Loughner was dangerous to others. Doctor Tomelleri noted that Loughner had several times thrown plastic chairs against a metal grill, behind which was Dr. Pietz, and at a wall; had tried to throw toilet paper at a camera; had spat and "lunged" at one of his attorneys (a characterization the defense disputes); continued to suffer from auditory hallucinations; laughed inappropriately; made poor eye contact; and repeatedly yelled the word "No!" Comparing the relative merits of psychotropic medication and other, less intrusive treatment options, Dr. Tomelleri wrote:

> Treatment with psychotropic medication is universally accepted as the choice for conditions such as Mr. Loughner's. Other measures, such as psychotherapy, are not practicable and do not address the fundamental problem. Minor tranquilizers (benzodiazepines) are useful in reducing agitation, but have no direct effect on the core manifestations of the mental disease. Seclusion and restraints are merely temporary protective measures with no direct effect on mental disease.

---

[2]Before the hearing began, Getchell asked Loughner if he desired any witnesses present for the hearing. Loughner responded, "Just my attorney." Getchell interpreted this statement as a request for legal representation at the hearing, and so informed the doctors conducting the administrative hearing. Loughner's attorneys were not contacted.

Dr. Tomelleri concluded that involuntary medication was justified but neither identified the proposed medication regimen nor established any limits on what medication might be administered.

Loughner appealed the authorization of involuntary medication. On the appeal form, he wrote: "You can't make me take any drug! I know it's cruel punishment," and added profane comments. Getchell confirmed that Loughner wished to appeal the decision of the hearing psychiatrist and that he desired to submit the incoherent, profanity-laced statement; Getchell made no effort to develop actual arguments in support of the appeal.

The prison's Associate Warden for Health Services ("the warden") upheld Dr. Tomelleri's authorization of involuntary medication. The warden concluded that Loughner was dangerous to others because he "engag[ed] in conduct, like throwing chairs, that is either intended or reasonably likely to cause physical harm to another or cause significant property damage." He further informed Loughner that "medication is the best treatment for your symptoms," and that "[m]inor tranquilizers, seclusion or restraints are only temporary in nature and have no direct effect on your symptoms or illness."

On June 21, Dr. Sarrazin filled out an administrative note indicating that Loughner was to be treated twice daily, for 30 days, with 0.5 mg oral solutions of Risperidone.[3] That same day, defense counsel first became aware of the involuntary medication decision. Soon thereafter, defense counsel filed a motion in the district court seeking to enjoin Loughner's involuntary medication. Proffering testimony from a former Bureau Of Prisons official and a forensic psychiatrist with a background in prison administration and involuntary medica-

---

[3]If Loughner refused the oral solution, he would instead be treated twice daily with 5 mg intramuscular injections of Haloperidol Lactate and 1 mg intramuscular injections of Benztropine.

tion decisions, defense counsel argued that Loughner's status as a pretrial detainee entitled him to an evidentiary hearing before the court as a prerequisite to involuntary medication, and that the prison had not sufficiently justified the need for psychotropic drugs over less-intrusive alternatives.

The district court held that Loughner was entitled neither to a judicial evidentiary hearing on the involuntary medication issue nor to the heightened substantive standards advocated by the defense. Instead, the court adopted the approach of *United States v. Morgan*, 193 F.3d 252, 262-63 (4th Cir. 1999), and reviewed the prison's *Harper I* determination for arbitrariness. Finding "no evidence that the FMC staff is in any way an ally of the Government prosecution team," and pointedly noting that 18 U.S.C. § 4241(d) did not charge FMC-Springfield's staff "with the *obligation* to restore [Loughner] to competency," the court concluded that "the procedures followed by the FMC staff at the § 549.43 hearing, and the finding of the presiding independent psychiatrist, were not arbitrary." The court further concluded that the procedural protections afforded Loughner satisfied *Harper*'s due process requirements.

## B.   The Emergency Medication Proceeding

On July 1, a motions panel of this Court granted Loughner's motion for a temporary stay of involuntary medication pending appeal. On July 12, the panel continued the stay, with the clarification that it applied specifically to psychotropic medication and that other measures (such as involuntarily administered tranquilizers) remained available. In response to this Court's stay orders, FMC-Springfield immediately stopped administering Loughner's psychotropic medication.

Loughner's condition deteriorated significantly after the sudden withdrawal of medication. On July 8, FMC-Springfield placed him on suicide watch. Ten days later, FMC-Springfield doctors determined that he was a severe

danger to himself and authorized psychotropic medication on an emergency basis, a decision this Court was also asked to stay but did not. On August 11, the defense filed a motion seeking to enjoin the emergency administration of psychotropic medication, which the district court denied.

### C. The Second Harper *Proceeding*

On August 25, FMC-Springfield conducted a second *Harper* hearing ("*Harper II*"), pursuant to 28 C.F.R. § 549.46, the newly promulgated replacement for 28 U.S.C. § 549.43. *See* 76 Fed. Reg. 40229-02, 2011 WL 2648228 (Aug. 12, 2011). Doctor Tomelleri again concluded that involuntary psychotropic medication was justified, this time based on the threat Loughner's behavior posed to his own safety. On administrative appeal from the *Harper II* involuntary medication order, the warden determined that the *Harper II* proceeding was invalid because the administrative hearing officer had failed to obtain a pre-hearing witness statement from Loughner's requested witness (defense counsel Anne Chapman).[4]

### D. The Third Harper *Proceeding*

On September 15, 2011, FMC-Springfield conducted its third *Harper* hearing ("*Harper III*"). Doctor Tomelleri, again presiding, concluded that involuntary psychotropic medication was justified on the basis of the danger Loughner posed to himself. In reaching this result, Dr. Tomelleri noted that Loughner's condition deteriorated significantly after involuntary medication was discontinued in July, and observed that, although many of Loughner's psychotic symptoms had abated after medication resumed, he continued to exhibit signs of restlessness, guilt, and suicidal ideation.

---

[4]Getchell's appeal form failed to specify any grounds for reversal. The procedural defect in the *Harper II* proceeding may have been brought to the warden's attention through complaints raised earlier in the district court by Loughner's attorneys.

Doctor Tomelleri determined that psychotropic medication was justified because "[d]iscontinuation . . . is virtually certain to result in an exacerbation of Mr. Loughner's illness as it did when medication was discontinued in July." Echoing, nearly verbatim, the justification asserted in the *Harper I* and *Harper II* proceedings, he added that "[p]sychotropic medication is the treatment of choice for conditions such as Mr. Loughner is experiencing," and rejected "[o]ther measures, such as psychotherapy, [because they] do not address the fundamental problem." He further noted that "[s]eclusion and restraints are merely protective temporary measures with no direct effect on the core manifestations of the mental illness." As in the *Harper I* proceeding, Dr. Tomelleri did not specify any limits on the types or dosages medications that might be involuntarily administered or describe the proposed future treatment plan. He did, however, list Loughner's current medication regimen, and indicated that a treatment plan could be found on Loughner's chart. On appeal, the warden determined that Loughner had been afforded his due process rights and, rejecting alternatives because they would "not impact the underlying cause or relieve the symptoms of [Loughner's] mental illness," upheld Dr. Tomelleri's involuntary medication order.

After his administrative appeal was denied, Loughner filed an emergency motion in the district court to enjoin his involuntary medication under the *Harper III* order. In addition to reiterating his previous arguments, Loughner argued that his staff representative had provided inadequate representation and that the Bureau of Prisons had not established that antipsychotic medication was needed to treat his dangerousness to self. The district court briefly addressed Loughner's motion at the § 4241(d)(2)(A) commitment hearing conducted on September 28, 2011, and in the ensuing written opinion.

*E.   Request for Commitment Pursuant to 18 U.S.C. § 4241(d)(2)(A)*

In her August 22 and September 7 progress reports to the district court, Dr. Pietz summarized Loughner's hospital

course, described his current mental status and psychiatric treatment, and provided her opinions as to the probability that he could be restored to competency for trial and as to the likely length of treatment toward that end. Doctor Pietz concluded that Loughner would likely be restored to competency "in the near future." The government accordingly asked the district court to commit Loughner for the purpose of restoring his trial competency, pursuant to 18 U.S.C. § 4241(d)(2)(A). Loughner filed a motion objecting to commitment under § 4241(d)(2) and asking the court to "engage in a predictive analysis not unlike that developed in *Sell* [*v. United States*, 539 U.S. 166 (2003)] and its progeny, in which the court must not only assess the substantial likelihood of competency restoration but also consider the potential side effects caused by the drugs used to restore competency."

## F.    *The September 28 Hearing*

On September 1, the district court issued an order scheduling Loughner's § 4241(d)(2)(A) commitment hearing. The order stated that "the scope of the hearing will be limited to the question of whether an additional period of time should be granted to actually restore the defendant to competency." The court also conducted a telephonic status conference in advance of the commitment hearing. During the telephonic conference, Dr. Pietz informed the court that Loughner wished to attend the commitment hearing. The court concluded that Loughner had a right to attend the hearing, pursuant to 18 U.S.C. § 4247(d), and accordingly "require[d] that [Loughner] be present for the extension hearing."

On September 28, the district court conducted the § 4241(d)(2)(A) commitment hearing. In addition to the district judge and counsel for both parties, Loughner, Dr. Pietz, and Dr. Ballenger (a clinical psychiatrist and expert witness for the government) convened at the Tucson courthouse for the proceedings. At the outset, the court reiterated its intention to restrict the evidentiary aspect of the hearing to the commit-

ment issue, even though other matters — specifically, the defenses's recently submitted motion to stay Loughner's involuntary medication under the *Harper III* order — were pending.

As the majority describes in fuller detail, Dr. Pietz and Dr. Ballenger testified at length about Loughner's progress and his prospects for restoration through involuntary medication. During the hearing, the court persistently emphasized that "[t]he limited focus here is whether an extension is likely — substantially probable to restore him." So stating, the court repeatedly prevented defense counsel from cross-examining Doctors Pietz and Ballenger regarding Loughner's diagnosis and the propriety of the drugs prescribed for treating his dangerousness. Although defense counsel argued that "[t]he restoration depends upon the treatment that's going to be given," the court reiterated that "[t]he question here is whether he's likely to be restored with an extended commitment to Springfield."

At the conclusion of the hearing, the district court determined that Loughner was likely to be restored to competency within a reasonable period of time, assuming he continued to receive involuntary medication. It accordingly held that Loughner's commitment should be extended by four months, pursuant to 18 U.S.C. § 4241(d)(2). The court emphasized that it was recommitting Loughner for the express purpose of restoration: "I'm now committing him for the purpose of restoration. No more evaluation. It changes today with this ruling. He's being committed for another four months for the purpose of restoration." It also expressed a concern that the procedural and substantive standards applicable under *Sell* when the government seeks to medicate involuntarily a pretrial detainee for purposes of restoration to competency were implicated by the court's decision to extend Loughner's commitment for the express purpose of restoration. "I'm committing him at a time that I know that they're continuing to treat him with medication that he declines to take," the court stated,

"I think this is a very different situation from what has existed to this point. I'm now telling them to continue to restore him. I think we're right up against *Sell*." The court concluded that a *Sell* judicial hearing, or at least some acknowledgment of the *Sell* issue, needed to take place, but stated that it was postponing the matter to a later date.

Before the hearing adjourned, defense counsel reminded the court of its pending motion to stay Loughner's involuntary medication. The court emphasized that it was "not being stubborn," but stated that it continued to believe that the Bureau of Prisons should determine the propriety of Loughner's involuntary medication so long as the purpose of medication related to his dangerousness, even if it was an essential predicate for the court's commitment decision. Reaffirming its reliance on *Morgan*, the court stated it would review the prison's *Harper III* determination only for arbitrariness and for compliance with 28 C.F.R. § 549.46 and *Harper*. The court concluded that there was "no arbitrariness in the third *Harper* hearing and that the medication going forward, at least of today, is authorized pursuant to the *Harper* case." Loughner appealed.

While Loughner's appeal was pending, the district court issued an order holding that Loughner is not entitled to a judicial *Sell* hearing regarding the propriety of pretrial involuntary medication where the ultimate goal is restoration of competency. The court acknowledged that it was "shifting the aim of [Loughner's] commitment from evaluation to restoration," but reasoned that "the Supreme Court, in *Sell*, contemplated that a pretrial detainee could be incidentally restored to trial competency by being medicated on dangerousness grounds under *Harper*." The court accordingly concluded that Loughner was not entitled to further *procedural* protections, because the prison "doctors have made a *medical* determination in this case justifying the need for medicating Mr. Loughner under *Harper*, which the Court has reviewed and has concluded was not arbitrary."

## II.  The Commitment Decision

The majority first labors to determine whether this case is governed by *Harper* or by *Sell*, and settles on the former with regard to the pretrial-medication-for-dangerousness question. The majority then proceeds to treat that prior medication decision as a background event that the district court did not need to revisit itself when deciding whether to commit Loughner to FMC-Springfield for restoration of competency. But the majority's analysis goes off course proceeding in this fashion, in two ways: The majority addresses the questions before *us* in the wrong order, as the commitment decision is the currently operative one. And it seeks to sort the issues we face into a preexisting "box" — that is, either *Harper* or *Sell* — when, in fact, this case presents us with somewhat novel questions.

Specifically, we must decide whether a district court may rely on a prior administrative authorization to medicate involuntarily a pretrial detainee based on dangerousness to self, issued while the detainee was under an earlier commitment order, to justify a new commitment for the express purpose of restoration of competency pursuant to 18 U.S.C. § 4241(d)(2)(A). The question is a difficult one, for it requires us to weigh the interests and values at stake in two separate, but related, proceedings, conducted for different reasons. Reviewing those interests, together with the principles gleaned from *Sell* and our post-*Sell* cases, I conclude that a court may not commit a pretrial detainee for the purpose of restoring his trial competency through involuntary medication without itself deciding that involuntary medication is both justified on some properly applicable ground and unlikely to infringe the detainee's fair trial rights.

Because of the way it structures its opinion, however, the majority does not squarely confront the now-dispositive question. Instead, the majority cleaves the issue of Loughner's involuntary medication from the question of his commitment

for restoration, even though the commitment decision was entirely dependent on continuing the involuntary medication during the entirety of Loughner's treatment for restoration of competency at FMC-Springfield. In other words, the majority holds that it was proper to commit Loughner to FMC-Springfield for restoration of competency because, *if* so committed, the earlier administrative decision to medicate him for dangerousness to himself could be relied upon, and if thus medicated, Loughner would likely become competent to stand trial. The logical flaw here is obvious: One cannot decide whether Loughner *should* be committed to restore competency by assuming an administrative medication decision that rested on the premise that he is already an inmate of the institution and needs to be medicated while there.[5]

Further, to justify its analysis, the majority holds that *whenever* dangerousness is the ground for involuntary medication — whether pre- or post-trial, and whether with the ultimate aim of restoration to competency or not — *Harper* governs entirely as to *both* the substantive and procedural safeguards. Why that should be so, we are not told. In particular, we are not told why the question of the propriety of involuntary medication on dangerousness grounds can be relegated to an administrative proceeding when: (1) it is the court that must decide whether Loughner is to be medically treated so as to

---

[5]The majority styles the district court's decision to commit Loughner pursuant to 18 U.S.C. § 4241(d)(2)(A) as an "extension" of his previous commitment under § 4241(d)(1). That is not precisely so. Section 4241(d)(1) authorizes the district court to "commit the defendant" for the purpose of evaluating "whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(1). Section 4241(d)(2)(A) authorizes the court to commit the defendant "for an additional reasonable period of time until his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward." 18 U.S.C. § 4241(d)(2)(A). So, the purposes of the two periods of commitment are different, and the judicial findings required to trigger them are concomitantly different.

be restored to competency; and (2) its decision in that regard depends on the availability of involuntary medication.

## A.    Sell *and its Progeny*

To my mind, *Sell* goes *almost* all of the way toward establishing that where, as here, the involuntary medication decision is embedded in a pretrial judicial decision concerning restoration of competency, the court must decide whether the defendant is to be involuntarily medicated. *Sell* does not address the precise situation here, in which there was a previous mid-commitment administrative involuntary medication decision.[6] But it does establish the proposition that a court must *itself* address the involuntary medication issue when, as here, the government's ultimate aim is restoration of competency, and the court is deciding the propriety of treatment toward that end. Because the relevant passage from *Sell* is sin-

---

[6]*Sell* concerned the involuntary medication of a pretrial detainee on trial competency grounds. 539 U.S. 166. After finding Sell incompetent to stand trial for various criminal charges, a magistrate judge ordered him committed to FMC-Springfield for the purpose of evaluating whether he would attain the capacity to allow his trial to proceed. *Id.* at 171. FMC-Springfield's medical staff administratively authorized Sell's involuntary medication on both trial competency and dangerousness grounds. *Id.* at 171-72. When Sell filed a motion challenging his involuntary medication, the magistrate who had committed Sell held an evidentiary hearing and also issued an order authorizing Sell's involuntary medication on both trial competency and dangerousness grounds. *Id.* at 172-73. On review of the magistrate's decision, the district court held that the magistrate's dangerousness finding was clearly erroneous, but further held that involuntary medication was justified on trial competency grounds. *Id.* at 173-74. The Eighth Circuit affirmed. *Id.* at 174. The Supreme Court assumed that Sell was not dangerous, because the government did not contest the dangerousness issue. *Id.* at 184. Focusing on the trial competence justification, the Court developed a four-pronged standard for determining whether involuntary medication is justified on trial competency grounds. *Id.* at 180-82. It further held, however, that courts should determine whether involuntary medication can be justified on "alternative, *Harper*-type grounds," such as dangerousness, before attempting to determine whether involuntary medication is necessary to restore a detainee's trial competency. *Id.* at 182-83.

gularly important to the correct disposition of this case, and is brushed aside by the majority, I quote it at length:

> We emphasize that the *court* applying these standards is seeking to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant competent to stand trial. A *court* need not consider whether to allow forced medication for that kind of purpose, if forced medication is warranted for a different purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk. There are often strong reasons for a *court* to determine whether forced administration of drugs can be justified on these alternative grounds before turning to the trial competence question.
>
> . . .
>
> [C]ourts typically address involuntary medical treatment as a civil matter, and justify it on these alternative, *Harper*-type grounds. Every State provides avenues through which, for example, a doctor or institution can seek appointment of a guardian with the power to make a decision authorizing medication — when in the best interests of a patient who lacks the mental competence to make such a decision. And *courts*, in civil proceedings, may authorize involuntary medication where the patient's failure to accept treatment threatens injury to the patient or others.
>
> If a *court* authorizes medication on these alternative grounds, the need to consider authorization on trial competence grounds will likely disappear. Even if a *court* decides medication cannot be authorized on

the alternative grounds, the findings underlying such a decision will help to inform expert opinion and judicial decisionmaking in respect to a request to administer drugs for trial competence purposes.

*Sell*, 539 U.S. at 181-83 (emphases added) (citations omitted).

The rhythmically insistent pulse of *Sell*'s refrain — "A court need not consider . . . . There are often strong reasons for a court to determine . . . . [C]ourts typically address . . . . If a court authorizes . . . . Even if a court decides . . . ." — repeatedly reinforces the command that a *court*, "asked to approve forced administration of drugs for purposes of rendering a defendant competent to stand trial," should *itself* begin by determining whether the drugs may be justified on alternative, *Harper*-type *substantive* grounds. *See id.* at 183. In other words, *Sell* recognized that the substantive reasons for an involuntary medication order and the applicable procedural protections are not necessarily tied together in discrete packages. Instead, where an ultimate judicial decision concerning medical treatment toward restoration of competency turns on involuntary medication, the court can vary the substantive ground for ordering involuntary medication, but must *itself* determine whether involuntary medication is appropriate on *some* proper basis.

*Sell* does not stand alone in this regard. Its predecessor, *Riggins v. Nevada*, 504 U.S. 127 (1992), stated that the government "certainly would have satisfied due process if the prosecution had demonstrated, *and the District Court had found*, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others." *Id.* at 135 (emphasis added) (citations omitted). Although this sentence from *Riggins* does not, as Loughner maintains, adopt as a holding the requirement of a no-less-intrusive-alternative finding, it does presage *Sell*'s insistence that, whatever the substantive standard is, the pertinent find-

ing, even as to medication for dangerousness, be made by a court, where that finding is an alternative to medication for trial competency purposes and restoration is the likely result.

Justice Kennedy's concurrence in *Riggins* reinforces this point, explicitly rejecting the analytical bifurcation of involuntary medication and trial-related proceedings. "I cannot accept the premise . . . that the involuntary medication order comprises some separate procedure, unrelated to the trial and foreclosed from inquiry or review in the criminal proceeding itself," Justice Kennedy wrote, "To the contrary, the allegations pertain to the State's interference with the trial." *Riggins*, 504 U.S. at 139 (Kennedy, J., concurring in the judgment). Similarly, I cannot, especially in light of *Sell*, accept the proposition that the involuntary medication order can be a separate, administrative procedure, even though the judicial commitment proceeding is part of the overall criminal prosecution and concerns whether Loughner can be restored to competency to stand trial through involuntary medication.

Our own cases similarly suggest that a court, asked to authorize restoration of a pretrial detainee to trial competency through mandatory administration of drugs, must itself determine whether medication can be justified on dangerousness grounds. In *United States v. Hernandez-Vasquez*, 513 F.3d 908 (9th Cir. 2008), we stated that "the *district court*, in an ordinary case, should refrain from proceeding with the *Sell* inquiry before examining dangerousness and other bases to administer medication forcibly," and added that the *court* should state its reasons for not proceeding under *Harper* if it chose to advance directly to the *Sell* analysis. *Id.* at 914 (emphasis added). Moreover, we cautioned that, "[o]n remand, the district court . . . . should take care to separate the *Sell* inquiry from the *Harper* dangerousness inquiry and not allow the inquiries to collapse into each other"— an instruction that would have made little sense if we had expected the prison to conduct the *Harper* hearing. *Id.* at 919; *see also United States v. Rivera-Guerrero*, 426 F.3d 1130, 1138 n.4

(9th Cir. 2005) (stating that "*the district court* should have conducted a *Harper* dangerousness hearing instead of proceeding under *Sell*") (emphasis added).[7]

Thus, where the government has asked the district court to authorize the detainee's restoration through involuntary medication, *Selll* and its progeny require *the court* to determine whether a pretrial detainee may be involuntarily drugged on dangerousness grounds, if that appears to be a feasible alternative to involuntary medication on restoration grounds alone. That is, of course, precisely what has happened here.

## B.   The Interwoven Medication and Commitment Decisions

Apart from brushing aside *Sell* and our related cases with regard to the need for a *judicial* decision whenever the ultimate aim is restoration of competency, the majority attempts to distinguish this case from *Sell* by separating the involuntary medication decision from the decision that Loughner could be restored to competency within a reasonable period of time if committed for treatment at FMC-Springfield. But the two issues cannot be disentangled in this manner.

18 U.S.C. § 4241(d)(2)(A) focuses the commitment for treatment inquiry on the likelihood of the detainee's restoration after the treatment. Obviously, a judge cannot meaningfully decide whether restoration to trial competency as a result of treatment is likely without knowing what treatment is con-

---

[7]The majority notes that our decision in *United States v. Ruiz-Gaxiola*, 623 F.3d 684 (9th Cir. 2010), references the district court's decision "order[ing] the government to conduct an administrative hearing pursuant to *Harper*, in order to evaluate whether involuntarily medicating Ruiz was justified on the alternative basis that his mental illness rendered him gravely disabled or dangerous to himself or others." Majority Op. at 2385 (citing *Ruiz-Gaxiola*, 623 F.3d at 689). The quoted language, however, comes from the court's factual recitation, and therefore does not even constitute dicta.

templated. And equally obviously, where the treatment contemplated is the administration of involuntary psychotropic medication, the detainee's prospects for restoration depend on the propriety of an order authorizing involuntary medication. Thus, as the majority acknowledges, the "involuntary medication decision is important to the overall outcome of the § 4241(d)(2) proceeding because it 'likely affect[s] both the scope and term of a § 4241(d)(2) order.' " Majority Op. at 2415 (quoting *United States v. Magassouba*, 544 F.3d 387, 418 n.27 (2d Cir. 2008)).

What the majority does not acknowledge, however, is that the involuntary medication order itself depends on the detainee's commitment. Certainly, a defendant would not be subject to involuntary medication were he released from government custody. Were he instead simply transferred from a mental health treatment facility to an ordinary pretrial detention center, changes to the circumstances of his confinement would necessitate a new involuntary medication proceeding to determine whether the inmate poses a danger to himself or others in the context of his new confinement.[8] Thus, the district court's decision to extend Loughner's commitment for the purpose of effecting his restoration both required and enabled the administration of involuntary medication. Under these circumstances, the prior administrative involuntary medication decision, made while Loughner was already committed to FMC-Springfield for a limited period and for a different purpose than is now at issue, cannot simply be *assumed* valid and

---

[8]An inmate may, for example, prove significantly more dangerous in prison than he would in a properly equipped mental ward. In *United States v. Weston*, 206 F.3d 9 (D.C. Cir. 2000) (per curiam), for example, the D.C. Circuit overruled the district court's finding of dangerousness, on the basis of expert testimony that the facilities at FMC-Butner were sufficient to prevent the detainee from harming himself or others. *Id.* at 13. Conversely, a detainee might present a greater danger in the hospitalization context than in pretrial detention, because the therapeutic needs of a facility committed to the inmate's restoration may dictate a lower degree of isolation than he would receive in the penal context.

treated as a background condition of the commitment decision.

### C.   The Reasons for Requiring Judicial Authorization of Involuntary Medication

I would therefore view the § 4241(d)(2)(A) commitment proceeding as functionally indistinguishable from the involuntary medication decision in *Sell*. And, as I have shown, *Sell* and our later cases could not be more clear in directing that, where restoration of trial competency is the ultimate goal, any decision to medicate involuntarily a pretrial detainee, even on dangerousness grounds, must be made in a judicial proceeding. As *Sell* does not elaborate on why that is so in any detail, I do so now, with particular attention to the circumstances we face. I conclude that, at the point at which a decision must be made concerning the detainee's commitment for restoration of competency to stand trial, the relative advantages of judicial involvement in the involuntary medication decision and concern for the impact psychotropic medication may have on the detainee's fair trial rights both counsel in favor of requiring the district court itself to resolve the involuntary medication issue, whether on dangerousness or other grounds. I review each of these considerations in turn.

### i.   The Benefits and Costs of Judicial Involvement

In deciding that a convicted, incarcerated prisoner is not entitled to a judicial hearing regarding the involuntary medication decision, *Harper* expressed significant concern over "the fact that requiring judicial hearings will divert scarce prison resources, both money and the staff's time, from the care and treatment of mentally ill inmates." *Harper*, 494 U.S. at 232. The Court also reasoned that these additional costs were not justified, given the specifically medical nature of the inquiry and the absence of any reason to doubt the administrative decisionmaker's impartiality. *See id.* at 233-35 & n.13. In the quite different context of a judicial decision concerning

pretrial treatment for restoration of competency, focused on the detainee's prospects for restoration of capacity to stand trial, there are several important purposes served by, and few reasons for avoiding, judicial resolution of the involuntary medication for dangerousness issue.

First, unlike the *Harper* context, in which the inmate has been convicted and is incarcerated for the term of his sentence, the marginal costs of judicial inquiry into the involuntary medication issue are minimal. A judicial hearing is required anyway for purposes of determining the propriety of treatment for restoration of competency.

Here, for example, the district judge, counsel for both parties, Loughner's treating psychologist (Dr. Pietz), a government expert witness with a background in clinical psychiatry (Dr. Ballenger), and Loughner himself were all present in the courtroom for the district court's September 28 commitment hearing. Concomitantly, the issues pertaining to Loughner's commitment for restoration (e.g., his likely reaction to psychotropic drugs, the need to continue medication throughout the extended commitment period, and so on) are closely related to the issues pertaining to whether he may be medicated involuntarily for dangerousness to self or others.

If Loughner's attorneys had been permitted to inquire at the September 28 hearing into the propriety of forced medication on dangerousness grounds, they could conceivably have established that such medication was not justified, and so treatment on that ground would not be the basis for any conclusion that Loughner could, if committed, be restored to competency in a reasonable period of time. The marginal difficulty of requiring the court to explore whether Loughner's involuntary medication is justified on dangerousness grounds, in addition to determining whether that medication, if administered, will likely restore his trial competency, would be immeasurably less than for a convicted prisoner, as to whom no legal proceedings at all are ongoing, much less proceed-

ings focused on matters closely related to, and dependent upon, the involuntary medication determination.

Nor would requiring judicial determination in the present context encroach on the prerogative of the prison's medical staff. Like the criminal defendant in *Riggins* and the pretrial detainee in *Sell*, Loughner was already in the midst of government-initiated judicial proceedings that dealt explicitly with legal issues relating to his involuntary medication (i.e., whether the medication is likely to restore him to the capacity to permit the proceedings to go forward). *See Sell*, 539 U.S. at 175; *Riggins*, 504 U.S. at 139 (Kennedy, J., concurring in the judgment). Because the government has itself opened the door to judicial proceedings relating to involuntary medication, its professed concerns about judicial encroachment on matters of prison administration carry significantly less weight.

Moreover, where, as for the commitment decision, the question of the propriety of medication for dangerousness is embedded in an inquiry into the likelihood of restoration of competency, the district court is no worse placed, and in some respects better placed, than the prison's medical staff to render an objective and impartial decision. For one thing, FMC-Springfield's physicians are, like most physicians, professionally disposed to favor medical treatment. The district court recognized as much when it acknowledged that Loughner's physicians may be overly optimistic in forecasting his prospects for restoration through involuntary medication. "They're doctors," the court observed, "They want to help and heal people."

Doctor Tomelleri's involuntary medication orders bear out the district court's observation. The *Harper I*, *Harper II*, and *Harper III* orders repeatedly rejected less-intrusive measures, such as seclusion and physical restraints, because they have "no direct effect on mental illness," and justified the use of psychotropic medication on the grounds that only the psy-

chotropic drugs "address the fundamental problem." Doctor Tomelleri's preoccupation with treating Loughner's underlying mental illness, although professionally appropriate, could have significantly clouded his judgment as to whether the drastic measure of involuntary psychotropic medication was justified under the temporary detention circumstances.

This skew may well have influenced the original involuntary medication decision, which was premised on dangerousness to others. At that point, Loughner's manifestations of dangerousness consisted of throwing some plastic chairs against a metal grill and a wall, throwing some toilet paper at a camera, and spitting and "lunging" at his attorneys (a characterization the attorneys dispute, but as to which there has been no evidentiary hearing). Although very likely manifestations of serious mental illness, these incidents do not appear to have endangered anyone and would be most unlikely, I would think, to have triggered involuntary psychotropic medication — as opposed to physical security measures — in most incarceration contexts. *See Weston*, 206 F.3d at 13.

Further, Loughner's FMC- Springfield physicians in particular are, unlike physicians in other jail and prison settings, charged with additional duties that could color their medication for dangerousness decision. FMC-Springfield was previously charged with treating Loughner as necessary "to determine whether there is a substantial probability" that he can be restored to competency, 18 U.S.C. § 4241(d)(1), and is now charged with treating Loughner for the express purpose of restoring him to competency. *See* 18 U.S.C. § 4241(d)(2)(A). Where, as here, the detention facility's medical staff perceive involuntary medication as "the only option for restoring [the detainee] to competency," the institutional responsibility to restore competency if possible is likely to color the medical staff's deliberations regarding involuntary medication on any grounds.

Indeed, there is some indication that this confusion of roles occurred with respect to FMC-Springfield's involuntary medication decisions in this case. For example, Loughner's Notice of Medication Hearing and Advisement of Rights form, filled out by Dr. Pietz, stated: "Reason for Treatment: Mr. Loughner suffers from a mental illness and refused to take the medication prescribed to him. He was referred to this facility to restore competency." Contrary to the district court's observation that Loughner's prison physicians "remain free to find that he cannot be, or has not been restored," the language of Loughner's notice form suggests Dr. Pietz believed that Loughner was sent to FMC-Springfield "to restore competency" (which was not true; the commitment was for evaluation, *see* 18 U.S.C. § 4241(d)(1)) and that the purpose of involuntary medication was to restore Loughner's competency for trial, *not* to treat dangerousness.[9] Such instances support the conclusion that the district court may be better placed than the prison's administrative decisionmakers to render an objective decision on the involuntary medication of a pretrial detainee for purposes of dangerousness to self.

Although the majority suggests otherwise, Majority Op. at 2395 (citing *Harper*, 494 U.S. at 233-34), this particular structural conflict theory did not come into play in *Harper*. In the postconviction context, the prison's administrative decisionmakers did not confront any statutory restoration obligations that could potentially interfere with the "necessary independence to provide an inmate with a full and fair hearing." *See Harper*, 494 U.S. at 233.

---

[9]Nor is this a one-time problem. The district court's opinion in *Sell*, which expressed concern that the government's "claim of dangerousness may . . . be a post hoc justification," noted that Sell's Notice of Medication Hearing and Advisement of Rights form stated "that the reason for [Sell's] treatment [with antipsychotic medication] was to 'Restore competency to stand trial.'" *United States v. Sell*, No. 4:97-cr-290, 2001 WL 35838455, at *5 (E.D. Mo. April 4, 2001).

The majority also suggests that the courts are ill-suited for making medical judgments about a detainee's medication treatment and should avoid doing so wherever possible. Majority Op. at 2394-95. Courts are not institutionally disabled from deciding such questions. As *Sell* recognized, they "typically address involuntary medical treatment as a civil matter, and justify it on these alternative, *Harper*-type grounds." *Sell*, 539 U.S. at 182; *see also, e.g.*, *Kulas v. Valdez*, 159 F.3d 453, 455-56 (9th Cir. 1998). For example, the criteria courts must apply in determining whether a federal criminal defendant may be civilly committed strongly resemble the criteria applied by the Bureau of Prisons' administrative decisionmakers in *Harper* proceedings. *Compare* 18 U.S.C. § 4246(d) *with* 28 C.F.R. 549.46(a)(7). Indeed, the district court's decision to extend Loughner's commitment itself involved a medical judgment as to the likelihood that Loughner's current regimen of psychotropic medication will successfully induce his restoration within the authorized period. If we can trust the court's acumen to determine, after an evidentiary hearing at which experts appear, that a certain medication regimen is likely to restore Loughner's capacity to stand trial, there is no reason simultaneously to distrust that same court's ability to ascertain whether that same medication is needed to make him less dangerous to himself or others.

ii.   The Concern for Fair Trial Rights

Central to the holding in *Sell* was the understanding that the side-effects associated with psychotropic medication may severely prejudice a defendant's right to receive a fair trial. Here, for example, Dr. Pietz testified that Loughner has developed a flat, emotionless aspect since resuming psychotropic medication. The district court further observed that Loughner "did appear to be tired" at the commitment proceeding and "did appear to close his eyes from time to time today and maybe a little sleepy or nod off." This "sedation-like effect" may result in "serious prejudice" during trial proceedings "if medication inhibits [Loughner's] capacity to react and

respond to the proceedings and to demonstrate remorse or compassion." *Riggins*, 504 U.S. at 143-44 (Kennedy, J., concurring in the judgment). "The tendency of psychotropic medication to flatten or deaden emotional responses" could prove particularly damaging if the government seeks the death penalty, as it very well might in this case, because "the jury would then be especially sensitive to [Loughner's] character and any demonstrations of remorse (or lack thereof)." *Weston*, 206 F.3d at 20 (Tatel, J., concurring).

Even the *intended* effects of psychotropic drugs may infringe Loughner's fair trial rights. Assuming Loughner will put on an insanity defense, manifestations in court of how his mind works may well be his own best evidence. Because psychotropic medication chemically alters the brain, it "deprives the jury of the opportunity to observe the defendant in the delusional state he was in at the time of the crime." *Id.* at 21 (Tatel, J., concurring). The government's decision to restore Loughner's trial competency may therefore prevent him from putting on his chosen defense, by altering the material evidence for that defense. *See Riggins*, 504 U.S. at 139, 142 (Kennedy, J., concurring in the judgment).[10] Thus, both the intended and unintended effects of psychotropic medication can conceivably deprive a criminal defendant of his right to a fair trial.

There is no point in restoring a defendant's trial competency, through commitment to a medical facility and involuntary administration of psychotropic medication, if the means necessary to effect restoration will so infringe the defendant's fair trial rights as to render the trial itself unconstitutional.

---

[10]The fair trial concerns associated with government-ordered, pharmacologically-induced sanity may be mitigated by the availability of other evidence pertaining to the insanity defense. *See Weston*, 206 F.3d at 22 (Tatel, J., concurring) (suggesting that, on remand, the district court should determine whether the combination of psychiatric testimony and video recordings of the defendant in his delusional state would enable defense counsel to mount an effective insanity defense).

That is why *Sell* requires a court to find, *before* ordering involuntary medication on trial competency grounds, that the involuntary medication to be administered is both substantially likely to render the defendant competent to stand trial *and* substantially unlikely to create side-effects that would render his trial unfair. *See Sell*, 539 U.S. at 181 (citing *Riggins*, 504 U.S. at 142-45 (Kennedy, J., concurring in the judgment)). Only then, the Court observed, will the medication sufficiently advance the trial-related interests put forward to justify depriving the defendant of his liberty to reject medical treatment. *See id.* And, although the Court did not expressly so state, the possible impact of involuntary medication on the ultimate trial explains *Sell*'s repeated insistence on the need for a *court* to determine the need for involuntary medication on grounds of dangerousness where restoration of trial competency is the government's ultimate goal. *See id.* at 181-83.

Given the particular circumstances of this case — namely, a commitment proceeding governed by 18 U.S.C. § 4241(d)(2)(A) — there is the same need for a judicial determination as to how the psychotropic drugs will likely impact Loughner's fair trial rights, even though dangerousness to self is the immediate reason for his involuntary medication. To commit Loughner for the purpose of restoration, the court must conclude that there is a "substantial probability" that he "will attain the capacity to permit the proceedings to go forward" during the commitment period. *See* 18 U.S.C. § 4241(d)(2)(A). Thus, § 4241 requires the court to focus on whether Loughner's commitment is likely to advance the prosecution's trial-related interests. Pretrial commitment for restoration of competency will likely not "permit the [trial] proceedings to go forward" if Loughner can only be restored through means likely to render any resulting trial unfair. So the district court may only commit Loughner for restoration of trial competency if it concludes that the psychotropic

means through which his restoration is to be accomplished are substantially unlikely to infringe his fair trial rights.[11]

Of course, at the time of the § 4241(d)(2)(A) commitment hearing, there may not be sufficient evidence to support the conclusion that involuntary psychotropic medication will render the trial unfair. But that should not excuse the district court from its responsibility to evaluate the evidence that is available according to its own best lights, providing "both the defendant, whose right to present a defense may be infringed by involuntary medication, and the government, whose eventual prosecution of the defendant may be foreclosed because of the infringement," with the best available "pre-medication resolution of the Sixth Amendment issue." *Weston*, 206 F.3d at 14. If the district court concludes that there is insufficient evidence to reach a final conclusion on the impact involuntary medication will have on the defendant's fair trial rights, it could simply defer the issue until some later, pre-trial date. *See id.* at 21 (Tatel, J., concurring). The government would then, however, bear the risk that the court might bar criminal prosecution if it subsequently concludes that the drugs have infringed the defendant's fair trial rights. Regardless of whether the court had sufficient evidence to resolve Loughner's fair trial rights concerns at the time of the commitment hearing, however, the inquiry is not, as the majority asserts, "premature and irrelevant at this stage." Majority Op. at 2419.

---

[11]Insisting that § 4241(d)(2)(A) obligates the courts to determine only whether the defendant will become competent to stand trial, the majority holds that the district court was not required to determine prospectively whether the pharmacological means used to effect Loughner's restoration will infringe his right to a fair trial. Majority Op. at 2417-19. But nothing in § 4241(d)(2)(A) supports such a restrictive reading. Congress could have used the word "competency" if it so desired, but instead it chose a more inclusive, functionally-focused phrase — "the capacity to permit the proceedings to go forward" — which, in plain terms, encompasses any psychological condition that might prevent a trial from ensuing.

*D. Conclusion*

In short, I would hold that a district court asked to commit a pretrial detainee for the purpose of restoring his trial competency through involuntary medication must itself determine whether involuntary medication is justified. In doing so, it should first consider, as in *Sell*, whether the medication is justified on grounds of dangerousness to self or others. If the court concludes that involuntary medication is justified, it may then proceed to determine whether involuntary medication is likely to restore the detainee's capacity to such a point that trial may proceed. But I would require the court to determine, as part of that inquiry, whether the contemplated treatment is substantially unlikely to infringe the detainee's fair trial rights. I cannot agree with the majority's conclusion that the district court could authorize Loughner's commitment under § 4241(d)(2)(A) on the bare determination that the medication he is currently receiving is likely to restore his purely cognitive trial competency, meaning the ability to appreciate the course of the proceedings and confer with counsel, with no consideration of either the medication's propriety or its potential effect on his fair trial rights.

## III. The Involuntary Medication Order

Because I conclude that the district court was obligated itself to decide anew the involuntary medication issue in conjunction with its § 4241(d)(2)(A) commitment determination, I consider the propriety of the prison's *Harper III* involuntary medication order moot in all relevant respects. I nevertheless proceed to review the deficiencies I see in those proceedings, for two reasons.

First, in reviewing the administrative involuntary medication order, I wish to clarify the substantive standards and associated requirements I believe must be applied by the district court in deciding whether involuntary medication is justified on dangerousness grounds.

Second, I disagree with the majority's conclusion that the *Harper III* involuntary medication order otherwise satisfies the demands of substantive and procedural due process. Setting aside my conviction that the procedural posture of this case requires a court to adjudicate the merits of Loughner's involuntary medication, I agree that a mid-commitment medication decision on dangerousness grounds need not be made by a judge. Where an otherwise proper judicial commitment decision has already been made, either for a certain period or indefinitely, it is appropriate to regard direct judicial intervention, even pretrial, as both unnecessary and burdensome. Moreover, in that circumstance, the penological and liberty interests are similar, in many respects, to those that pertain post-conviction. But despite that basic procedural agreement, I would hold that the *Harper III* involuntary medication order cannot stand, given its substantive and procedural shortcomings.

## A.  *Substantive Due Process*

### i.  Modifications to the *Harper* Standard

I agree with the majority's conclusion that involuntary medication may be justified even if it is not necessarily the least restrictive alternative. The so-called "*Riggins* standard," put forth by Loughner to justify the least restrictive alternative requirement, simply does not exist; *Riggins* rejected the opportunity to "finally prescribe such substantive standards." 504 U.S. at 136. In light of *Sell*'s command to determine whether medication is justified on *Harper*-type grounds prior to deciding whether medication is justified to restore competency, 539 U.S. at 183, I do not dispute the application of *Harper*'s substantive standard, broadly construed, to the decision to medicate a pretrial detainee for dangerousness to self or others.

*Harper*'s substantive due process standard was, however, expressly predicated on the particular circumstances of a con-

victed prisoner's confinement. *See Harper*, 494 U.S. at 222. It must therefore be modified to accommodate the pretrial context of Loughner's confinement.

*Harper* identified three general factors as particularly important to assessing the constitutional validity of a prison regulation authorizing the use of involuntary medication: (1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) the impact accommodation of the asserted constitutional right would have on guards and other inmates, and on the allocation of prison resources generally; and (3) the availability of "ready" alternatives. 494 U.S. at 224-25. The pretrial context of Loughner's confinement significantly affects our application of these factors, in at least two respects.

First, Loughner's status as a pretrial detainee narrows the scope of the government's legitimate interests in restricting his constitutional rights. Where the government seeks to medicate involuntarily a convicted prisoner, its legitimate long-term correctional interests countervail, to a degree, the prisoner's liberty interest in avoiding the intended, mind-altering effects of psychotropic medication. The federal sentencing standards, for example, recognize that "correctional treatment," including appropriate medical care, can be legitimately imposed on a convicted defendant. *See* 18 U.S.C. § 3553(a)(2)(D); 18 U.S.C. § 3563(b)(9). When the government seeks to medicate a convicted prisoner on dangerousness grounds, these treatment interests provide a modicum of justification for preferring long-term, systemic correction, through involuntary psychotropic medication, of the mental illness causing the convict's dangerousness, over temporary interventions that will not alleviate the condition causing the dangerousness. *See Harper*, 494 U.S. at 225.

The government may not, however, assert such correctional interests as a justification for restricting the constitutional

rights of a pretrial detainee. We have recognized that "[a]ll legitimate intrusive prison practices have basically three purposes: the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." *United States v. Hearst*, 563 F.2d 1331, 1345 n.11 (9th Cir. 1977) (per curiam) (internal quotation marks omitted). The first two interests, which are regulatory in nature, may be asserted as legitimate justifications for restricting the constitutional rights of pretrial detainees, but the government's *correctional* interest in punishment or rehabilitation may not. *Id.*; *see, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 537 (1979); *Mauro v. Arpaio*, 188 F.3d 1054, 1065 (9th Cir. 1999). Instead, "the Due Process Clause requires conditions of pretrial confinement to be analyzed according to whether they are appropriate to ensure the detainees' presence at trial and to maintain the security and order of the detention facility." *Halvorsen v. Baird*, 146 F.3d 680, 689 (9th Cir. 1998). As *Halvorsen* observed, these principles are of ancient vintage. *See id.* Blackstone, for example, wrote that pretrial detention "is only for safe custody, and not for punishment: therefore, in this dubious interval between the commitment and trial, a prisoner ought to be used with the utmost humanity; and neither be loaded with needless fetters, or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only." IV William Blackstone, Commentaries on the Laws of England 297 (1769) (quoted by *Halvorsen*, 146 F.3d at 689).

Second, the temporary context of Loughner's pretrial confinement means that inquiry into the effectiveness and cost-efficiency of involuntary medication as compared to alternatives must be limited to the relative short-term. Some alternatives may be more appropriate than involuntary psychotropic medication if they are equally effective and cost-efficient over that short-term, even if they will not affect the detainee's long-term dangerousness. So, while *Harper* rejected physical restraints as an acceptable substitute for involuntary medication in part because "[p]hysical restraints are effective only in

the short term," 494 U.S. at 226, that rejection might not carry over in some pretrial contexts. Involuntary medication may therefore be appropriate as a long-term solution for a dangerous, mentally-ill convicted prisoner and yet inappropriate as a short-term solution for a dangerous, mentally-ill pretrial detainee.

In light of these adjustments of perspective appropriate to the pretrial context, I am skeptical that the prison's asserted justification for involuntary medication could carry the day on the present record.[12] Doctor Tomelleri concluded that psychotropic medication is justified because it "is the treatment of choice for conditions such as Mr. Loughner is experiencing," and rejected various alternatives because they are "merely protective temporary measures with no direct effect on the core manifestations of the mental illness." But, in the pretrial context, "protective temporary measures" may be precisely what is called for, and there may therefore be no cognizable governmental interest in addressing "the core manifestations of the mental illness." Doctor Tomelleri's justifications thus demonstrate a misapprehension of the appropriate inquiry in the pretrial context.[13]

---

[12]Of course, on my analysis, the present record would not be the pertinent one with respect to the commitment determination. Instead, the district court would hold a hearing at which both sides would present witnesses addressing the availability of approaches other than medication to alleviate dangerousness.

[13]I do not mean to suggest that an involuntary medication order must disregard any consideration of a pretrial detainee's long-term reaction to psychotropic medication. Indeed, we have held that involuntary psychotropic medication may only be considered medically appropriate where the "likelihood and value of the long-term benefits outweigh the likelihood and severity of the long-term harms." *Ruiz-Gaxiola*, 623 F.3d at 706. The medical appropriateness inquiry, however, is only triggered *after* medication is justified for some legitimate governmental purpose (e.g., restoration to trial competency, dangerousness to self or others, etc.). *See id.* at 703. Unlike the medical appropriateness inquiry, the determination of whether or not medication is justified must be focused on the specific context of confinement — and it is at this stage of the analysis that the short-term nature of a pretrial detainee's confinement becomes salient. Doctor Tomelleri failed to acknowledge this vital distinction.

This criticism is not meant to presage that the outcome of the medication for dangerousness-to-self inquiry in the pre-trial context is foreordained. Instead, it is to say that attention to the *particular* circumstances of a specific pretrial detainee is essential in determining whether there are ready alternatives to medication. In Loughner's case, those circumstances might include the likely significant length of the pretrial period, as well as the needs and capabilities of the mental health facility to which he is committed.

### ii.   Specificity of Proposed Treatment

*Harper* instructed that a decision to medicate involuntarily must be medically appropriate. *See Harper*, 494 U.S. at 227. *Sell*, which incorporated *Harper*'s medical appropriateness requirement, observed that "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Sell*, 539 U.S. at 181. Interpreting the medical appropriateness requirement in *United States v. Hernandez-Vasquez*, we observed that "*Sell*'s discussion of specificity would have little meaning if a district court were required to consider specific drugs at a *Sell* hearing but then could grant the Bureau of Prisons unfettered discretion in its medication of a defendant." 513 F.3d at 916. We therefore held that, to satisfy the medical appropriateness requirement, "the district court's order must identify: (1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress." *Id.* at 916-17.

We have never identified the government's *purpose* in seeking involuntary medication, whether dangerousness or trial competency, as a relevant factor in applying the medical appropriateness requirement. Instead, we have assumed that

the same requirement for a specific treatment plan applies in both contexts. In *United States v. Williams*, 356 F.3d 1045 (9th Cir. 2004), for example, we applied the medical appropriateness requirement, under the *Harper* standard, to a supervised release condition that required the convict to take antipsychotic medication under threat of reincarceration. *Id.* at 1056-57. And in *Rivera-Guerrero*, we held that *Williams*'s interpretation of the medical appropriateness requirement applies to the medical appropriateness inquiry under *Sell*. *See* 426 F.3d at 1137 (citing *Williams*, 356 F.3d at 1056). *Hernandez-Vasquez* should therefore apply with equal force in all involuntary medication contexts.

Moreover, the reasons supporting a specification requirement in the *Sell* context apply with equal force where medication is justified on dangerousness grounds. *Sell* proceeded from that premise, stating that "[t]he specific kinds of drugs at issue may matter here *as elsewhere*." *Sell*, 539 U.S. at 181 (emphasis added). With no specific limits — or at least prescribed ranges or categories — covering the types, dosages, and duration of a patient's involuntary medication, Dr. Tomelleri could not meaningfully evaluate the medication proposal, as compared to alternatives (including an alternative medication regime). This particularized focus, for reasons already noted, is of special importance with regard to pretrial medication for dangerousness. In this context, the governmental interest in long-term correction evaporates: Drugs with serious side effects, though appropriate where ultimate cure is the goal, may not be medically indicated (or may be indicated in lower doses) for elimination of symptoms alone.

The majority maintains that cabining the discretion of Loughner's treating physicians in this way would prevent them from adjusting his medication regimen to changing circumstances. This concern was addressed by *Hernandez-Vasquez*. In that case, we held that the specifications in the involuntary medication order "should be broad enough to give physicians a reasonable degree of flexibility in responding to

changes in the defendant's condition," and noted that the government or the defendant "may move to alter the court's order as the circumstances change and more becomes known about the defendant's response to the medication." 513 F.3d at 917.[14]

I would therefore hold that an involuntary medication order premised on dangerousness to self or others, like an order premised on restoration to competency, must identify the types, maximum dosages, and estimated duration of an inmate's involuntary medication. In the procedural regime I favor for this case, in which the involuntary medication decision would be made as part of the proceedings concerning commitment for restoration of competency, the order could provide substantial medical flexibility; in the administrative regime the majority presupposes, the order can be more focused, as adjustments can be accomplished on site and through the facility's independent hearing officer(s). The policy approved in *Harper* operated in just this way, providing regular review by the administrative hearing committee as to both the type and dosage of the drugs to be administered. *See Harper*, 494 U.S. at 216, 232-33.

Because Dr. Tomelleri did not tailor his analysis to the temporary, nonconviction, pretrial context, and did not provide specific directions to Loughner's treating physicians regarding the types of drugs, the maximum dosages to be administered, or the estimated duration of involuntary medication, I would hold that FMC-Springfield did not properly determine whether involuntary medication was medically appropriate, even for the period of Loughner's prior commitment.

---

[14]The majority, of course, holds that no judicial hearing was necessary. All the more reason to require that the involuntary medication order include a fairly specific treatment plan, as a treating physician could, with minimal effort, seek modification of an administrative involuntary medication order issued by a member of the same prison medical staff.

## B. Procedural Due Process

### i. Periodic Review

Both the predecessor to the currently operative regulation and the state policy at issue in *Harper* contained provisions requiring periodic administrative review of an inmate's involuntary medication. *See* 57 Fed. Reg. 53820-01, 1992 WL 329581 (Nov. 12, 1992); *Harper*, 494 U.S. at 216, 232-33. The present regulation, 28 C.F.R. § 549.46, does not include such a periodic review requirement. The majority, concluding that periodic review is not constitutionally required, holds that its absence does not render 28 C.F.R. § 549.46 constitutionally infirm. Majority Op. at 2392-93.

I disagree. *Harper* concluded that a judicial hearing might "not be as effective, *as continuous*, or as probing as administrative review using [the prison's] medical decisionmakers," in part because the state policy at issue required the administrative hearing committee to "review[ ] on a regular basis the staff's choice of both the type and dosage of drug to be administered." *See id.* at 232-33 (emphasis added). Such continuity is especially important because involuntary medication is, as the majority notes, "a fluid process" that "must be adjusted depending on how the patient reacts and why [sic], if any, side effects are experienced." Majority Op. at 2416. Under such circumstances, periodic review is necessary to ensure the continued accountability of the inmate's treating physicians.

The majority maintains that the short-term context of a pretrial detainee's confinement alleviates the need for periodic review. Majority Op. at 2392. Not so, or at least, not necessarily. Pretrial confinement, although inherently temporary, is not inherently brief. In *Rivera-Guerrero*, for example, we observed that the defendant had been committed at FMC-Springfield for nearly two years and had been involuntarily treated with antipsychotic medication for approximately one

year. 426 F.3d at 1143. In *United States v. Weston*, 326 F. Supp. 2d 64 (D.D.C. 2004), the district court authorized an additional six-month commitment, even though defendant had already been committed for roughly five years and had been treated with involuntary medication for two and one half years. *See id.* at 67. I cannot reconcile the concept of due process with the conclusion that a pretrial detainee may be involuntarily treated with psychotropic medication for several years on the basis of a single administrative hearing.[15]

In this case, I am concerned that Loughner's deterioration after the discontinuation of medication in July will be used to justify involuntary medication for years on end. I find this possibility deeply troubling both because the absence of periodic review deprives Loughner of the opportunity to demonstrate that he no longer needs medication, or as much medication, and because the true causes of Loughner's psychological deterioration remain murky. The particular symptoms provoking particular concern for Loughner's own safety were not observed before his medication was suddenly withdrawn. On the record made available to us, it is impossible to ascertain whether the rapid deterioration Loughner experienced in July was caused by the emergence of his underlying mental illness, by the jarring manner in which his medication was discontinued, or, perhaps, by the imposition of the rigors of a suicide watch. Periodic administrative review could perhaps (although not necessarily) mitigate some of these causation concerns by providing for routine reevaluation of the need for involuntary psychotropic medication, as well as the type and amount of medication prescribed.

---

[15]Under my preferred approach, on the other hand, the district court would be required to review the justification for involuntary medication at each commitment hearing. Because pretrial detainees may only be committed for a "reasonable period of time," to be ascertained in advance by the district court, *see* 18 U.S.C. § 4241, the provision of regularly recurring commitment proceedings would satisfy the need for periodic review.

ii. Right to Counsel

On my preferred approach, the involuntary medication determination in this case would have been made in court, and Loughner's ordinary right to full representation by counsel would pertain. But even for mid-commitment dangerousness determinations made pretrial, I disagree with the majority's conclusion that Loughner is not entitled to the assistance of counsel, to a limited extent, in connection with the administrative involuntary medication hearing. Majority Op. at 2397.

As the majority points out, *Harper* held (in the post-conviction context) that lawyers are not necessary participants is an administrative involuntary medication determination, because their legal expertise bears no relation to the relevant medical judgment. *See Harper*, 494 U.S. at 236. In the pretrial context, however, there is, as pointed out earlier, heightened potential for *legal* confusion among the detention facility's physicians as to both their statutory responsibilities and the proper purpose of an administrative involuntary medication order. Here, for example, Loughner's treating psychologist initially viewed competency restoration as the primary purpose of Loughner's involuntary medication, and the involuntary medication decisions seems focused on long-term cure rather than short-term safety. *See supra* Section II(C)(i).

Staff representatives are insufficient protection against such confusion. They lack the requisite legal expertise and, as here, often do not assert themselves in the medication hearing. *See Morgan*, 193 F.3d at 266; *United States v. Humphreys*, 148 F. Supp. 2d 949, 953 (D.S.D. 2001); *United States v. Weston*, 55 F. Supp. 2d 23, 26-27 (D.D.C. 1999). Moreover, and critically, lawyers for pretrial detainees are in the process of preparing and implementing an overall defense strategy. As that strategy will often be influenced by the events during, and results of, a medication hearing, excluding lawyers from any involvement in that hearing constitutes an impediment to the right to counsel with regard to the impending prosecution. A

misstep at the administrative medication hearing could well impact the ultimate likelihood of conviction in a manner that could be foreseen by the defendant's lawyer but not by the defendant — a lay person who is, by definition, incompetent — or the lay staff representative. Thus, pretrial detainees have a significantly greater interest in the right to counsel than convicted prisoners.

Conversely, the government's interest in excluding counsel from the administrative hearing is weaker with regard to a pretrial detainee than with respect to a convicted prisoner. In the pretrial context, there is no punitive or rehabilitative interest in isolating the inmate from society generally. That is why, in the pretrial context, "part of the process due to a person if his liberty is taken is the opportunity to communicate with someone outside the institution where he is held, at a time and in a manner consistent with practical management of booking and confinement procedures and institutional security and order." *Halvorsen*, 146 F.3d at 689.

Given the different balance of interests in the context of pretrial confinement for restoration, I would hold that a pretrial detainee has a limited right to the participation of counsel in connection with the administrative involuntary medication hearing. Briefly sketching the contours of this right, I would hold that the prison must: (1) notify the pretrial detainee's counsel of its intention to conduct an involuntary medication hearing, as well as the types, maximum dosages, and expected duration of the proposed involuntary medication; (2) provide the detainee's counsel an opportunity to confer with the staff representative prior to the involuntary medication hearing; and (3) allow the detainee's counsel to observe the involuntary medication hearing or, if there is a good reason to exclude the attorney from the proceedings, provide an audio-visual recording of the hearing.

Providing the detainee's counsel with notice of the involuntary medication hearing and an opportunity to confer with the

staff representative would allow counsel to apprise the staff representative of relevant legal issues, including: the importance of identifying a valid purpose for an administrative medication decision and of establishing the requisite specificity in the medical record; proper consideration of available alternatives; and the detainee's various procedural rights in connection with the administrative hearing. Recognizing these benefits, courts have often ordered detention facilities to inform counsel of any proposed involuntary medication hearings and to provide an opportunity for counsel to engage in pre-hearing conference with the detainee's staff representative. *See Humphreys*, 148 F. Supp. 2d at 953; *Weston*, 55 F. Supp. 2d at 26.

Furthermore, just as a public trial "remind[s] the prosecutor and judge of their responsibility to the accused and the importance of their functions," *United States v. Waters*, 627 F.3d 345, 360 (9th Cir. 2010), allowing counsel to witness the administrative hearing would remind the hearing's participants of the important *legal* rights affected by an involuntary medication determination. And counsel's observation of the administrative hearing would expedite judicial review of any resulting involuntary medication order, because counsel would not need to resort to discovery to familiarize itself with the administrative proceedings. These benefits more than justify the limited right to counsel sketched above.

As to whether the lawyer must be permitted to participate in the hearing, I would leave that question to be decided on a case-by-case basis. With notice, the attorney will have the opportunity to seek full representation rights from the court on a showing that, in the particular circumstances, there is a need for direct representation so as to preserve the defendant's rights as to ultimate conviction.

### iii.  Adequacy of Loughner's Staff Representative

Quite aside from the exclusion of counsel, the staff representation in this case was a charade, and violated even the majority's lax due process standards.[16] Throughout the successive administrative involuntary medication hearings, Loughner's staff representative consistently failed to seek out or present any witnesses, cross-examine or challenge the prison's witnesses, or advocate in any other meaningful way against forced medication. What he did was sit in the room and, after the hearing concluded, see that Loughner's appeal form was filed. No more. Such anemic "representation" falls well below the standard demanded by due process and 28 C.F.R. § 549.46(a)(3). *See Morgan*, 193 F.3d at 266; *Humphreys*, 148 F. Supp. 2d at 953; *Weston*, 55 F. Supp. 2d at 26-27.

Judge Bybee (but not Judge Wallace) recognizes the troubling deficiencies in the representation afforded by Loughner's staff representative. But he regards them as effectively harmless because, he insists, the district court's September 28 commitment hearing provided Loughner sufficient opportunity to challenge the prison's involuntary medication decision. Majority Op. at 2410-12.

Not so, as review of the district court's orders and statements surrounding the September 28 hearing demonstrates. The district court reiterated, in its September 30 order, the position it had taken consistently theretofore — that its only role with respect to the institution's medication for dangerousness decisions was to review for adequacy of procedures, not to entertain evidence or arguments substantively challenging the determination. The evidentiary aspect of the September 28 hearing was therefore restricted to the specific question

---

[16]Of course, under my approach, the district court would have determined the propriety of involuntary medication at the commitment hearing and Loughner would have been entitled to representation by counsel.

whether Loughner's prior treatment — that is, involuntary medication — would, if continued, likely result in his timely restoration to competency, not whether that treatment was needed to mitigate Loughner's dangerousness to himself or medically appropriate for that purpose.

Judge Bybee's suggestion to the contrary has no basis in the sequence of events leading up to the September 28 hearing or in the record of that hearing. First, in its July 1 order reviewing the prison's *Harper I* determination, the district court held that Loughner was not entitled to an evidentiary hearing to contest the administrative determination of dangerousness. Instead, the court adopted the holding of *Morgan*, 193 F.3d at 262-63, and reviewed the prison's *Harper I* determination for arbitrariness and compliance with 28 C.F.R. § 549.46. The district court then consistently reaffirmed this holding, stating in its August 30 order that "[t]he defense's motion for a post-deprivation [judicial] hearing is denied."

Consistent with the district court's settled view of its extremely limited role as to the involuntary medication decision, its September 1 order scheduling Loughner's § 4241(d)(2)(A) commitment hearing gave no indication that the court intended to reverse its prior practice and hold an evidentiary hearing on the involuntary medication issue. Instead, the court stated quite clearly that "the scope of the [commitment] hearing will be limited to the question of whether an additional period of time should be granted to actually restore the defendant to competency." Although the court also suggested that the parties should be prepared to state their positions regarding the necessity of scheduling a *Sell* involuntary medication hearing at some later point, the court never suggested allowing an evidentiary hearing on the prison's involuntary medication for dangerousness determination as part of its commitment hearing.

During the pre-hearing telephonic conference, the district court further explicated its concern that a *Sell* hearing may be

required where a court orders a pretrial detainee recommitted for restoration through the involuntary administration of psychotropic medication. "I think it is a game changer and a significant event that I — if I do extend him, the purpose for the extension is for restoration," the court stated, "Knowing that he is being involuntarily medicated, I think it is incumbent upon the court at that point to conduct a *Sell* hearing." The court, however, reiterated its decision to focus on the commitment decision and leave the involuntary medication issue for another day, stating: "As I forecast, I think [the necessity of a *Sell* hearing is] an issue that is timely now and that we have to get to. But the immediate issue is whether there is enough evidence to support an extension on the substantial probability that [Loughner] can be restored. How they restore him and what due process rights he has during that period is a secondary issue. It's one I intend to get to ultimately. But the immediate issue is just this question of whether an extension is warranted."

At the September 28 hearing, the district court repeatedly declared its intention to restrict the evidentiary hearing to the commitment issue. Doctor Pietz provided detailed testimony concerning Loughner's condition and his prospects for restoration. When defense counsel attempted to cross-examine Dr. Pietz regarding Dr. Sarrazin's diagnosis and its relation to the prescribed antibiotics, however, the government objected on relevance grounds and the court sustained the objection, reminding the defense that "the limited focus here is whether an extension is likely — substantially probable to restore [Loughner]." The court further stated: "I'm well familiar with all of the background reports. I've read them myself. You'll have the opportunity, obviously, at some point when that's relevant to go over those. But the questions should focus on going forward."

Doctor Ballenger provided generalized testimony about the likelihood and duration of psychiatric restoration through involuntary medication, gave an opinion as to Loughner's

prospects for restoration based on his medical history and medication regimen, and passed on the propriety of Loughner's current medication. But when defense counsel attempted to cross-examine Dr. Ballenger regarding the *medical appropriateness* of Loughner's involuntary medication regimen, the court chided the digression. "[T]he appropriateness of the treatment is a matter for a *Sell* hearing or some later hearing," the court said, "It's not the subject of this hearing." Defense counsel responded that "[t]he restoration depends upon the treatment that's going to be given." The court, however, persisted in its refusal to expand the scope of the evidentiary hearing, stating that "[t]he question here is whether he's likely to be restored with an extended commitment to Springfield. I'd like both sides to keep focused on that . . . . I want to focus on the issue of the day, which is whether he's to be extended and whether the standard of proof is met by the evidence."

Then, in response to defense counsel's request for a ruling on its motion to stay Loughner's involuntary medication, the court responded that its "view continues to be . . . that because [the involuntary medication order is] predicated on the ground of dangerousness and really has nothing to do with [Loughner's] competency to stand trial, that that's an issue with the Bureau of Prisons and the physicians there, and for good reason." Following the approach adopted in its July 1 order, the court applied *Morgan*'s arbitrariness standard and concluded that "there's no arbitrariness in the third *Harper* hearing and that the medication going forward, at least of today, is authorized pursuant to the *Harper* case." The Court reaffirmed this holding in its written order, which appropriately characterized its review of the administrative *Harper III* determination as "minimal."

In short, the district court's pre-hearing orders, the statements it made during the September 28 hearing itself, and its written post-hearing order, all demonstrate, without doubt, that the evidentiary aspect of the hearing was restricted to a specific question — whether Loughner's current treatment

will likely result in his timely restoration, *assuming* the continuation of involuntary medication. No evidentiary challenge to that treatment was permitted. Instead, following the approach outlined in its July 1 Order, the court conducted a "minimal review" of the prison's *Harper III* determination and concluded that the decision was not arbitrary. Nowhere did the court contemplate or suggest a reversal of its previous holdings that Loughner is not entitled to an evidentiary hearing on the issue of his involuntary medication for dangerousness. Indeed, when defense counsel argued that the district court had simply deferred to the Bureau of Prisons on the *Harper* determination, the district court responded: "What I've said is that there is another basis for him being medicated that has nothing to do with me. It has to do with dangerousness."

In light of the district court's strict limitations on the scope of its evidentiary hearing and the extraordinary deference it accorded the prison's involuntary medication decisions, the majority's conclusion that the September 28 hearing provided Loughner an adequate opportunity to challenge his involuntary medication rests on air, nothing more.

## IV.   Conclusion

For the foregoing reasons, I would reverse the district court's order approving Loughner's commitment for restoration of competency. And although on my view there would be no reason independently to consider the propriety of the September 15 involuntary medication for dangerousness decision at this juncture, were I to do so I would conclude that it was invalid for failure to provide Loughner with the due process and right to counsel protections appropriate to the circumstances. I therefore respectfully dissent.